## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEANNE M. MARRAZZO[1]                )
                                     )
              Plaintiff,             )
                                     )
        v.                           )
                                     )
ROBERT F. KENNEDY JR.                )
In his official capacity as Secretary )
of the Department of                 )
Health and Human Services            )
200 Independence Avenue, S.W.        )
Washington, D.C. 20201;              )          Civil Action No._____
                                     )
DEPARTMENT OF HEALTH                 )
AND HUMAN SERVICES                   )
200 Independence Avenue, S.W.        )
Washington, D.C. 20201;              )
                                     )
JAYANTA BHATTACHARYA                 )
In his official capacity as Director  )
of the National Institutes of Health  )
9000 Rockville Pike                  )
Bethesda, Maryland 20892;            )
                                     )
NATIONAL INSTITUTES                  )
OF HEALTH                            )
9000 Rockville Pike                  )
Bethesda, Maryland 20892;            )
                                     )
MATTHEW MEMOLI                       )
In his official capacity as Principal )
Deputy Director of the National      )
Institute of Allergy and             )
Infectious Diseases                  )
9000 Rockville Pike                  )
Bethesda, Maryland 20892,            )
                                     )
              Defendants.            )

---

[1] Dr. Marrazzo resides in Montgomery County, Maryland. In a concurrently filed motion, Plaintiff has requested a waiver of the requirement under Local Rule 102.2(a) to provide her home address in the case caption.

# COMPLAINT

Plaintiff Jeanne M. Marrazzo, M.D., M.P.H., alleges as follows:

## INTRODUCTION

1.      Jeanne M. Marrazzo, M.D., M.P.H., served as Director of the National Institute of Allergy and Infectious Diseases ("NIAID") at the National Institutes of Health ("NIH") from August 2023 until her involuntary removal on March 31, 2025, which was followed by her termination on September 26, 2025.  Dr. Marrazzo replaced Dr. Anthony Fauci, who had served as NIAID's Director for thirty-eight years.  Dr. Marrazzo was preeminently qualified for the NIAID position, and her appointment was met with great acclaim by the scientific community.  Dr. Marrazzo excelled as NIAID Director and received the highest possible performance ratings for her outstanding work.

2.      Immediately following the inauguration of President Donald J. Trump in January 2025 and his appointment of Robert F. Kennedy Jr. as Secretary of the U.S. Department of Health and Human Services ("HHS"), HHS and NIH leadership began censoring scientific research, subordinating scientific integrity to unscientific and unsupported political preferences, and undermining NIH's mission to further scientific research.  The new leadership implemented policies in furtherance of their anti-vaccine ("anti-vax") political agenda, accepting Secretary Kennedy's position that vaccines are unnecessary for healthy populations.  In so doing, they rejected decades of incontrovertible scientific evidence to the contrary.

3.      Moreover, to align with President Trump's executive orders on diversity, equity, and inclusion ("DEI"), HHS leadership abruptly cut all research grants that contained the words "diversity," "equity," or "inclusion" in their titles or descriptions, thereby canceling numerous important research grants over the objections of scientific experts.  Many terminated grants had

nothing to do with the Administration's intended targets in its anti-DEI initiatives but were cut anyway because they contained phrases like "health equity" in their program descriptions.

4.      HHS leadership also abruptly cut funding to vital clinical trials, endangering trial participants who relied on life-saving medical interventions through those trials.  HHS leadership ended multi-year-long research projects poised to provide valuable contributions to the medical field, wasting substantial funds and already-invested resources.  Among those targeted were projects using mRNA platforms to enable rapid vaccine responses to emerging pathogens and incurable cancers, and projects to develop medical countermeasures for the coronavirus family of viruses.  In fact, the majority of NIH grants and contracts canceled in 2025 were in the area of infectious diseases.

5.      Dr. Marrazzo vigorously opposed these and other reckless actions that constituted a substantial and specific danger to public health and safety.  In multiple emails, conversations, and meetings with NIH and HHS leadership, Dr. Marrazzo objected to the censorship of scientific research and the subordination of scientific integrity to unscientific and unsupported political biases, including the abrupt cancellation of grants and clinical trials for political reasons. She also vigorously objected to leadership's anti-vax agenda, explaining that such positions harmed public health.

6.      In response to Dr. Marrazzo's whistleblower activity described above, HHS removed her from her position as NIAID Director and proposed to reassign her to the Indian Health Service ("IHS").  HHS's stated reason for this blatantly retaliatory act was a purported need to address IHS's "untenable vacancy rate" at the IHS.  HHS placed Dr. Marrazzo on administrative leave pending her reassignment, directed her not to return to work, and soon

withdrew her access to NIH equipment and facilities. HHS never actually reassigned Dr. Marrazzo to the IHS.

7.      In September 2025, Dr. Marrazzo filed a whistleblower retaliation complaint and a disclosure of government wrongdoing with the U.S. Office of Special Counsel ("OSC"). Dr. Marrazzo also spoke to the media about the retaliation against her; HHS's hostility towards vaccines and scientific research aimed at controlling infectious diseases, especially among vulnerable populations; HHS's abrupt cancellation of clinical trials; and other actions by the Trump Administration that censored scientific research and harmed public health. Three weeks later, Secretary Kennedy terminated Dr. Marrazzo's employment.

8.      HHS removed Dr. Marrazzo from her position as NIAID Director and terminated her employment because she raised concerns—both internally within HHS and externally to the OSC and the media—about government actions that she reasonably believed constituted a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; a substantial and specific danger to public health or safety; and censorship related to scientific research or the integrity of the scientific process. The concerns she raised constitute protected activity under the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 1213(a), and her disclosures to the OSC and the media about matters of public concern are protected by the First Amendment to the United States Constitution.

9.      Because she is not a political appointee, Dr. Marrazzo has civil service rights under the Civil Service Reform Act of 1978 ("CSRA"), which protect her from whistleblower retaliation and provide a process to safeguard her right to merit-based employment practices. Under the CSRA, she may submit a whistleblower retaliation complaint to the OSC and bring appeals to the Merit Systems Protection Board ("MSPB"). The CSRA created the MSPB and

4

OSC as independent agencies to safeguard federal employees' rights, ensure fair treatment, and uphold the merit system to ensure that it is insulated from improper political influence. However, actions by the Trump Administration have fully eroded the independence of the MSPB and OSC and have made these agencies beholden to the Administration. They are no longer functioning as Congress intended, and Dr. Marrazzo's claims cannot be fairly investigated or adjudicated in these forums.

10.     Because proceeding in the OSC and MSPB would be futile, Dr. Marrazzo brings her claims in this Court. She requests that this Court review and grant relief on the grounds that Defendants' actions violated the CSRA and WPA, her Fifth Amendment rights to due process, and her First Amendment rights to free speech; were taken without any constitutional authority; and are a legal nullity. Plaintiff seeks equitable relief in vindication of her statutory and constitutional rights; declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; mandamus relief under 28 U.S.C. § 1361 and the All Writs Act, 28 U.S.C. § 1651; and relief under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States.

12.     This Court also has jurisdiction under 28 U.S.C. § 1361 because this action seeks a writ of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff.

13.     Venue is appropriate in this judicial district under 28 U.S.C. §§ 1391(b)(1), (b)(2) and (e) because at least one Defendant resides in this District, a substantial part of the events or

omissions giving rise to the claims occurred in this District, and Defendants are agencies of the United State and officers or employees of the United States acting in their official capacities.

14.     Sovereign immunity is waived under 5 U.S.C. § 702, which entitles Plaintiff to relief when Defendants acted unconstitutionally and beyond statutory authority.

**PARTIES**

15.     Dr. Marrazzo is a preeminent physician and internationally recognized scientist with a focus on infectious diseases.  She holds a bachelor's degree in biology from Harvard University and an M.D. from Thomas Jefferson University.  She completed a residency in internal medicine at Yale-New Haven Hospital before earning a Master of Public Health in Epidemiology from the University of Washington.  She has served in multiple national and international leadership roles, chairing both the American Board of Internal Medicine ("ABIM") Council and the ABIM Infectious Disease Specialty Board.  She is an elected member of the National Academy of Medicine and a Fellow of the American College of Physicians and of the Infectious Diseases Society of America.  She served as NIAID Director from September 24, 2023, until her involuntary removal on March 31, 2025.

16.     Defendant Robert F. Kennedy Jr. is sued in his official capacity as HHS Secretary. Secretary Kennedy terminated Dr. Marrazzo's employment with NIAID by letter dated September 26, 2025, purportedly "[p]ursuant to the U.S. Constitution, Article II, § 2, cl. 2, and 42 U.S.C. § 284(a)."

17.     Defendant HHS is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701, subject to the jurisdiction of this Court.  The mission of HHS is to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying

medicine, public health, and social services." *About HHS*, U.S. DEP'T OF HEALTH AND HUM. SERV., https://www.hhs.gov/about/index.html (last visited Dec. 7, 2025). HHS is comprised of multiple agencies and units, including the Centers for Disease Control and Prevention, the Centers for Medicare and Medicaid Services, and the National Institutes of Health.

18.    Defendant Jayanta Bhattacharya, M.D., is sued in his official capacity as Director of NIH. Dr. Bhattacharya assumed the directorship on April 1, 2025—Dr. Marrazzo's first day on administrative leave.

19.    Defendant Matthew J. Memoli, M.D., is sued in his official capacity as Principal Deputy Director of NIAID. Dr. Memoli additionally served as Acting NIH Director from January 22 to March 31, 2025.

20.    Defendant NIH, part of HHS, is the primary agency of the United States federal government responsible for furthering medical research. It conducts and supports basic, clinical, and translational medical research into the causes, treatments, and cures for both common and rare diseases. NIH is comprised of 27 Institutes and Centers, each devoted to a unique biomedical discipline. NIAID is one such Institute, and its mission is to conduct basic and applied research to better understand, treat, and prevent infectious, immunologic, and allergic diseases. Both NIH and NIAID are headquartered in Maryland and maintain their offices there.

## FACTUAL BACKGROUND

### Dr. Marrazzo's Appointment as NIAID Director and Early Tenure

21.    Dr. Marrazzo was appointed NIAID Director after a rigorous and competitive international hiring process. After Dr. Marrazzo submitted a detailed application and letter in January 2023 establishing her qualifications, NIH officials conducted extensive interviews with her in March and April of that year, exploring her research, background, and vision for NIAID.

Interviewers included half a dozen NIH Institute and Center Directors, non-government research scientists, community health leaders, and several other scientists from within NIH, including NIH's then-Acting Director, Dr. Lawrence Tabak.  In late June 2023, former HHS Secretary Xavier Becerra offered Dr. Marrazzo the position of NIAID Director, contingent upon the successful completion of a background and security check.

22.     Dr. Marrazzo assumed the position of NIAID Director on September 24, 2023, initially reporting to Acting Director Tabak, then to Director Monica Bertagnolli, then to Acting Director Matthew Memoli, and finally to Director Jayanta Bhattacharya.

23.     As NIAID Director, Dr. Marrazzo was responsible for determining the strategic direction for basic and clinical research in immunology, infectious diseases, and allergies, aiming for new vaccines, diagnostics, and therapies; managing the Institute's mandate to address emerging infectious disease threats, overseeing and coordinating activities across NIAID's various intramural labs and extramural research programs; serving as the primary contact with the NIH Director, other HHS components, federal agencies, Congress, professional societies, and advocacy groups; and overseeing the Institute's $6.6 billion annual budget.  During her first 18 months as NIAID Director, Dr. Marrazzo worked with internal and external stakeholders to craft a new NIAID strategic plan, reconstituted the Office of the Director after the previous Director retired, and oversaw and furthered valuable research.  By all objective measures, she performed her duties and responsibilities in an outstanding manner, and she received the highest possible performance rating in her only performance review dated January 1, 2025.

24.     Following the inauguration of President Donald Trump in January 2025 and his appointment of Robert F. Kennedy Jr. as HHS Secretary, Dr. Marrazzo quickly became alarmed by actions taken by HHS and NIH leadership that directly undermined NIH's goal of furthering

medical research, constituted a substantial and specific danger to public health and safety, and wasted funds by abandoning years-long research projects before scientists could define and implement their findings.

25.    On January 22, 2025, the Trump Administration appointed Dr. Memoli to serve as Acting NIH Director, pending the Senate's confirmation of President Trump's nominee for NIH Director, Dr. Jayanta Bhattacharya.  This was a significant promotion for Dr. Memoli, who was an investigator in the NIH Intramural Research Program within NIAID, managing only a small subsection of an intramural laboratory, and had no leadership or administrative experience commensurate with any prior Acting or permanent NIH Director.  Given this, Dr. Marrazzo and her colleagues were surprised and concerned by Dr. Memoli's promotion.

26.    Dr. Memoli had previously spoken out publicly about his opposition to the vaccination of healthy people during the COVID-19 pandemic and his desire for a religious exemption to the NIH COVID vaccination requirement for its employees.  *See, e.g.*, Jenny Strasburg, *Vaccine-Mandate Debate Makes It to Federal Agency Where Fauci Works*, WALL ST. J. (Nov. 7, 2021), https://www.wsj.com/health/healthcare/vaccine-mandate-debate-makes-it-to-top-federal-research-agency-11636286400.  Dr. Memoli explicitly confronted the previous Director of NIAID, Dr. Anthony Fauci, in an email in 2021 objecting to vaccine mandates.  *See id.*  He also articulated his opposition to the term "DEI" and related activities prioritized by many organizations, including the previous Administration.  While Dr. Memoli's position on the COVID vaccine represented a decidedly minority view within the scientific community, it aligned with the political, non-scientific opinions of Secretary Kennedy and other Trump Administration officials.

27.     During a meeting of Institute and Center Directors ("ICD") including Dr. Marrazzo and senior NIH leaders on February 13, 2025, Dr. Memoli announced that NIH would be "doing things differently," as HHS's agenda was changing to reflect that of Secretary Kennedy and the Administration.  He also indicated that HHS leadership would take a close look at all "foreign aid" coming out of NIH.  He emphasized that the Institutes should prioritize ensuring that their work aligned with President Trump's executive orders on DEI.  Remarking on a court's recent temporary injunction of some key parts of the President's executive actions related to diversity and gender, Dr. Memoli stated that judges were "hampering us."  He made it clear that implementing President Trump's executive actions was more important than ensuring scientific integrity in NIH's research and peer review system, more important than continuing to fund collaborative international research, and ultimately more important than the research which had been at the heart of NIH's mission.  In fact, during this meeting, Dr. Memoli never mentioned public health, patient safety, or furthering scientific research.

**Dr. Marrazzo's Internal Whistleblowing Activity**

28.     On or around February 15, 2025, Dr. Marrazzo met with James McElroy, who had recently been named Deputy Chief of Staff at NIH, reporting directly to Dr. Memoli.  Mr. McElroy spent nearly the entire meeting asking Dr. Marrazzo basic and confrontational questions about NIAID and NIH, and Dr. Marrazzo was shocked by his lack of relevant knowledge.  Mr. McElroy acknowledged that he took the job with NIH because he admired President Trump and sought to advance the goals of his Administration.  When Mr. McElroy informed Dr. Marrazzo that the Trump Administration intended to significantly cut funding for foreign research, including research overseen by NIAID, Dr. Marrazzo immediately objected.  Dr. Marrazzo asserted that foreign research was vital to NIAID's mission of advancing scientific knowledge,

and that cutting grant funding for foreign research would harm NIAID's ability to complete its mission.

29.     On February 24, 2025, Dr. Marrazzo attended a meeting to brief the White House Office of Pandemic Preparedness and Response ("OPPR") on NIAID's role in biopreparedness and biosecurity, and she gave a presentation about pandemic preparedness-related activities at NIAID.  Near the end of the meeting, Dr. Memoli reiterated the Administration's position that vaccines are unnecessary if populations are healthy, especially in children.  Dr. Kathleen Neuzil, the then-Director of the Fogarty International Center, interjected to say that the country was on a trajectory to have the highest number of pediatric deaths from influenza in a single year, and that while most of these were in unvaccinated children, more than half of the children affected were previously healthy.  Dr. Neuzil agreed that treatment of chronic diseases was important but insisted that any credible disease prevention effort must include vaccines.  Dr. Marrazzo expressed agreement with Dr. Neuzil's position and reiterated that Dr. Neuzil's evidence about seasonal influenza affecting healthy children and the importance of vaccines was accurate.  Dr. Memoli was visibly frustrated with Dr. Marrazzo's statements and refused to make eye contact with her.  He repeated that there is nothing more important than making sure children are healthy to begin with and made clear that NIH should not focus on vaccines.

30.     During an ICD meeting on March 13, 2025, Dr. Memoli announced that the White House had directed NIH to suspend funding for some clinical trials.  He explained that NIH would cut funding for some clinical trials within the United States, including funding to Columbia University, which the White House was targeting because of concerns about antisemitism.  He also stated that NIH would cut clinical trials abroad because the Administration had concerns about oversight of awards to "foreign" partners, especially research

being conducted in partnership with South Africa, as outlined in the Executive Order about South

Africa, "Addressing Egregious Actions of the Republic of South Africa."  Exec. Order No.

14,204, 90 Fed. Reg. at 9497.

31.    Dr. Marrazzo immediately responded, during the same meeting, by objecting to

these proposed actions, stating that the cessation of clinical trials would endanger participant

safety because clinical trials provided necessary monitoring and medical interventions for their

participants.

32.    Dr. Marrazzo also brought up, during the March 13 meeting, a Columbia

University study of immunocompromised children who received treatment through an NIAID-

funded study in the NIAID Division of Allergy, Infectious Diseases, and Transplantation.  She

explained to Dr. Memoli and the other meeting attendees that cutting funds to Columbia would

mean that these children would no longer have access to the medical care they needed.  Another

example of harm provided by Dr. Marrazzo concerned participants in clinical trials of anti-HIV

medications for prevention, treatment, or cure.  She explained that the abrupt cessation of these

trials would end participants' access to life-saving medications—endangering not only

participants' health but those of their partners and, for pregnant women, their unborn children.

She further explained that the abrupt end of clinical trials would breach ethical standards at the

heart of the relationship between researchers and trial participants.  She explained that, at a

minimum, the well-established process of "orderly close-out" of any clinical trial should be

implemented.

33.    Dr. Marrazzo also raised concerns during that meeting about the lasting damage to

NIH's ability to recruit clinical trial participants in the future as a result of these intended actions.

She noted that NIH and NIAID had spent decades building trust with community partners,

especially populations more vulnerable to infectious diseases like tuberculosis and HIV, and the cessation of ongoing clinical trials would hamper NIH's ability to engage future participants. Lastly, she objected that the biological samples that had been gathered to measure participants' progress in these trials would not be able to be used or properly stored, and would go to waste.

34.     Dr. Memoli dismissed Dr. Marrazzo's concerns by stating, "Don't worry, there will be orderly closeout of all clinical trials," or words to that effect.  This statement has proven untrue, as many of the 383 clinical trials whose funding has been terminated since February 2025 have ended in a haphazard and reckless manner.  *See* Vishal R. Patel et al., *Clinical Trials Affected by Research Grant Terminations at the National Institutes of Health*, JAMA INTERN. MED. (Nov. 17, 2025), doi:10.1001/jamainternmed.2025.6088; Bruce Y. Lee, *NIH Grant Cuts Have Disrupted 383 Clinical Trials With 74,311 Patients*, FORBES (Nov. 20, 2025), https://www.forbes.com/sites/brucelee/2025/11/20/nih-grant-cuts-have-disrupted-383-clinical-trials-with-74311-patients/.

35.     During a March 27, 2025, ICD meeting, Acting Deputy Director for Extramural Research Jon Lorsch announced an overhaul of the process NIH uses to solicit and support vital scientific research.  He announced that NIH would begin to work on "repairing" its process of soliciting research proposals from the scientific community to ensure their compliance with the Trump Administration's political priorities.  Dr. Marrazzo asked him who would have the authority to decide whether research solicitation notices sufficiently complied with HHS priorities and what considerations would be applied to ensure that critical scientific research continued, especially during times of urgent public health needs.  Dr. Marrazzo also noted that she was concerned that excluding experts from decision-making about research would result in an arbitrary process, or one governed by other, non-scientific priorities.  Dr. Memoli and Dr.

Lorsch were visibly frustrated by Dr. Marrazzo's questions and brushed off the concerns she

raised.  Indeed, the President's August 7, 2025, Executive Order, "Improving Oversight of

Federal Grantmaking," followed by a recent notice outlining NIH's new approach, has generated

considerable concern in the scientific community.  *See, e.g.*, Bruce Y. Lee, *New NIH Process To*

*Choose Grant Awardees Will No Longer Use Paylines*, FORBES (Nov. 30,

2025), https://www.forbes.com/sites/brucelee/2025/11/30/new-nih-process-to-choose-grant-

awardees-will-no-longer-use-paylines/; Arthur Allen, *Changes at NIH Give Political Appointees*

*Greater Power To Fund or Block Research*, KFF HEALTH NEWS (Sept. 3, 2025),

http://kffhealthnews.org/news/article/nih-grants-trump-political-appointees-agenda-alignment-

peer-review/.

     36.    Since the beginning of the Trump Administration, approximately $8.9 billion in

research grants to nearly 2,600 recipients have been cancelled.  *See, e.g.*, Anil Oza, *NIH halts*

*grant terminations 'effective immediately,' email says*, STAT (Jun. 25, 2025),

https://www.statnews.com/2025/06/25/nih-halts-research-grant-terminations-email-shows/.

Beginning in February 2025, NIH leadership directed NIH employees to terminate a huge

number of grants, even in areas for which there is a statutory requirement to award funds.  The

terminated projects cover some of the most pressing public health issues of our time, including

cancer (*i.e.*, breast cancer, cervical cancer, uterine cancer, and anal cancer), stroke risk, cardiac

health, Alzheimer's Disease, HIV prevention, malaria, tuberculosis, suicide prevention, alcohol

use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19,

depression, psychopathology, pain, vaccine hesitancy, and the harmful health effects of

discrimination, poverty, racism, loneliness, trans-exclusionary policies, and social stress, as well

as the health-protective effects of social support, education, and school-based mental health

14

interventions.  *See* HHS Grants Terminated, HHS (Dec. 12, 2025),

https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf (listing specific grants

terminated by HHS).

37.    HHS regulations restrict the circumstances under which the government may

terminate a grant during the lifetime of the award, and do not allow HHS to terminate a grant

simply because it "no longer effectuates the program goals or agency priorities."  45 C.F.R.

§ 75.372; 2. C.F.R. §§ 200.340(a)(1)-(4).  Yet, in a document entitled *Staff Guidance – Award*

*Assessments for Alignment with Agency Priorities – March 2025*, which was approved by then-

Acting Director Memoli on February 28, 2025, NIH leadership directed staff to terminate certain

grants related to DEI, China, or gender identity, on the grounds that these grants "no longer

effectuate agency priorities."  Soon after, NIH issued a new policy to staff on March 25, 2025,

which noted that "NIH will no longer prioritize research and research training programs that

focus on Diversity, Equity and Inclusion."  Grants were to be cancelled for other reasons as well,

including if they involved China, transgender issues, vaccine hesitancy, and COVID-19.  As

outlined above, Dr. Marrazzo explicitly objected to these policies, noting that international

research and the inclusion of diverse groups of participants, many with elevated risk of infectious

diseases, were critical to advancing NIAID's mission.

**The Retaliatory Removal of Dr. Marrazzo from Her Position as NIAID Director**

38.    After Dr. Marrazzo made repeated objections to Dr. Memoli and NIH leadership

to actions taken by the Trump Administration that she reasonably believed evidenced a

substantial specific danger to public health or safety, gross mismanagement, a gross waste of

funds, and scientific censorship, HHS retaliated against her by removing her from her position as

NIAID Director and placing her on administrative leave.  On March 31, 2025, HHS sent Dr.

Marrazzo an email informing her that it had proposed reassigning her to the IHS, and that she would be placed on administrative leave as of April 1, 2025. Dr. Marrazzo was directed not to return to work and was told to respond to the email with her preferred choice of location for the IHS position: Alaska, Albuquerque, Bemidji, Billings, Great Plains, Navajo, or Oklahoma. While this reassignment was transparently retaliatory and was designed to force Dr. Marrazzo to resign, she declined to do so. Instead, Dr. Marrazzo responded that she was interested in learning more about the IHS opportunities. HHS failed to respond to her inquiry.

39.     Between March 31, 2025, and Dr. Marrazzo's termination five months later, HHS's only contact with her occurred on May 21, 2025, when HHS Human Resources asked her to send an updated resume, which she promptly sent. While on administrative leave, she received no further correspondence from HHS regarding the transfer to the IHS.

40.     In early May 2025, HHS stripped Dr. Marrazzo of access to her NIH email and all relevant NIH non-public websites, cancelling any remaining connection she had with NIAID.

**Dr. Marrazzo's OSC Complaint and Other Protected Activity**

41.     On September 4, 2025, Dr. Marrazzo filed a complaint with the OSC alleging that HHS retaliated against her for her protected whistleblowing by placing her on administrative leave. *See* Ex. A. The same day, Dr. Marrazzo also filed a disclosure action with the OSC in which she reported concerns related to HHS's arbitrary cancellation of NIH federal grants for scientific research; the unauthorized direction of $500 million in research funding to senior NIH officials, in contravention of scientific principles and NIH processes; the discriminatory termination of five members of the NIAID board of scientific counselors; and retaliation against whistleblowers. She reported the following to the OSC:

> a.  On May 1, 2025, NIH announced an unprecedented $500 million vaccine research program spearheaded by Dr. Memoli and Dr. Jeffery

16

Taubenberger, a senior investigator in the intramural research program who had previously collaborated on more than 30 papers with Dr. Memoli and was appointed Acting Director of NIAID after Dr. Marrazzo's placement on administrative leave. Typically, for large awards such as this, HHS publicly announces the funding opportunities and invites researchers to compete for the funding. Final funding decisions are typically made by a standard peer review process to ensure that federal research money goes to the projects with the greatest scientific merit and likelihood of success. Here, however, there was no indication that the decision to invest $500 million went through any of NIH's usual rigorous and competitive scientific review processes. Instead, the award was made without any scientific review process and solely at the direction of Secretary Kennedy, who personally instructed the Biomedical Advanced Research and Development Authority ("BARDA") and NIH officials to direct the $500 million to Dr. Memoli and Dr. Taubenberger. While Dr. Memoli is a prominent vaccine skeptic, Dr. Taubenberger holds a patent for the BPL vaccine platform, the technology at the heart of this award, and could reap a substantial financial benefit from this massive grant.

b. Between March 31 and April 11, 2025, then Acting NIH Director Dr. Memoli terminated five of the 13 members of the NIAID Board of Scientific Counselors ("BSC"). BSCs are advisory committees, composed of individuals with outstanding scientific credentials, that advise HHS leadership on the quality research conducted by NIH. The requirement for this scientific review of the intramural program at NIH is statutory, and the NIH Policy Manual details Board member's qualifications and appointment process. The NIH Policy Manuals also states that Board members are to serve for five-year terms because that allows them to "be involved more than once in the regular quadrennial review." There is no provision for their early termination. In direct contravention of NIH norms, policy, and statutory guidance, Dr. Memoli removed the five board members by letter stating that "[m]embers on this committee serve at the pleasure of the Director of the National Institutes of Health."

c. Of further concern, the dismissed scientists were four women and one man of color; no white male on the BSC for NIAID was dismissed, raising questions about whether there was a discriminatory basis for the firings. Bolstering that concern is the fact that many of the BSC members at other Institutes that Dr. Memoli terminated were also women and minorities. A total of 43 BSC members across NIH were terminated and of those terminated, 38 are female, Black, or Hispanic. Though NIH denied removing these scientists for their personal characteristics, Dr. Marrazzo was present at a meeting of NIH senior leaders where she heard Dr. Memoli say that, from that point forward,

all appointees to the BSCs would be based on merit, implying that those who were fired were not selected on that basis. To the contrary, the individuals removed were are all eminently qualified to serve on the BSC for NIAID, and their terminations were politically motivated. Dr. Marrazzo reported to OSC that on or about March 19, 2025, a NIAID staff member attended a meeting with some NIH leaders and expressed concern that it appeared that all the members of the BSC who were fired were women and/or members of a racial or ethnic minority group. In response, Mr. McElroy claimed responsibility for the decision regarding the dismissals and stated that BSC members were dismissed because of their history of political contributions, not their sex or race/ethnicity.

42.    After filing her OSC complaint, Dr. Marrazzo spoke out publicly about her concerns, including but not limited to those detailed in paragraphs 43–47 below, and received extensive media coverage.

43.    On the same day she filed her OSC complaints, Dr. Marrazzo spoke to *The New York Times*, STAT Online Magazine, and *The Washington Post*. The *New York Times* article reported on Dr. Marrazzo's OSC complaints and specifically on her allegations that the Administration downplayed vaccines, cancelled important vaccine studies, derailed federal grants, risked the health of clinical trial participants, wasted taxpayer money that had already been spent on studies, and defied court orders directing NIH to release grant money. Benjamin Mueller, *Whistle-Blower Complaints Detail Tension Over Vaccines at N.I.H.*, N.Y. TIMES (Sept. 4, 2025), https://www.nytimes.com/2025/09/04/health/nih-whistle-blower-complaints-vaccines-trump.html. The story also featured a quote from Dr. Marrazzo: "We have seen, in the U.S. and abroad, the devastating effects of not being prepared to fight these infectious diseases," with the derailment of promising vaccine research "putting us at such a disadvantage, and doing such a disservice to the American people, as far as maintaining their prospects for good health." HHS was aware of Dr. Marrazzo's participation in the article, as it contained a statement from an HHS spokesperson rebutting her claims.

44.     STAT, an online magazine, likewise reported on Dr. Marrazzo's illegal retaliation, and the allegations in her complaint concerning the Administration's cancellation of grants that conflicted with White House policy priorities and the creation of a new half-billion-dollar program that circumvented scientific peer review.  Anil Oza and Megan Molteni, *Two former top NIH officials say they were forced out in retaliation for objecting to grant terminations*, STAT (Sept. 4, 2025), https://www.statnews.com/2025/09/04/nih-whistleblower-complaints-research-grants-flu-vaccine-jeanne-marrazzo/.  The article also quoted Dr. Marrazzo, who spoke to STAT about the harmful effects of NIH's decreased focus on vaccines and infectious disease prevention.

45.     On September 5, 2025, *The Washington Post* published an article about Dr. Marrazzo's OSC complaints and the concerns she raised, including the Trump Administration's unscientific hostility towards vaccines, the illegal and harmful termination of billions of dollars of grants, and how "political review has been inserted into the scientific process."  Carolyn Y. Johnson, *Key NIH leader questioned vaccines, according to whistleblower complaints*, WASH. POST (Sept. 5, 2025), https://www.washingtonpost.com/science/2025/09/05/whistleblower-complaints-nih-vaccines/.  Dr. Marrazzo told the *Post*: "The effect on science moving forward is really damaging, and I don't think we're going to know the consequences of those actions for some time."  HHS was also aware of Dr. Marrazzo's participation in this article and again provided a statement rebutting her claims.

46.     On September 8, 2025, Dr. Marrazzo sat for a lengthy, televised interview with CBS nightly news.  Ed O'Keefe et al., *NIH whistleblower details clash over childhood vaccines with Trump administration: "We became inconvenient,"* CBS NEWS (Sept. 8, 2025), https://www.cbsnews.com/news/nih-whistleblower-marrazzo-trump-rfk-vaccines/.  During this

interview, Dr. Marrazzo, when asked whether she thought Secretary Kennedy was dangerous, said that she thought he was "because he ignores the evidence . . . . He appears to be driven by a desire to satisfy a need to tear things down, and to discredit people who have dedicated their lives to evidence and to interpreting that evidence to further Americans' health."

47.    Over the following week, Dr. Marrazzo's complaints were also featured in *Politico* and *The Atlantic*. Erin Schumaker and Ruth Reader, *Inside the NIH whistleblower complaints*, POLITICO (Sept. 8, 2025), https://www.politico.com/newsletters/future-pulse/2025/09/08/inside-the-nih-whistleblower-complaints-00550681; Katherine J. Wu, *The HHS Officials Being Paid Six Figures to Do Nothing*, THE ATLANTIC (Sept. 15, 2025), https://www.theatlantic.com/health/2025/09/nih-administrative-leave/684191/.

**The Retaliatory Termination of Dr. Marrazzo's Employment**

48.    On September 26, 2025, twenty-two days after Dr. Marrazzo filed her retaliation complaint and disclosure with the OSC, Secretary Kennedy sent her a letter terminating her employment. The letter stated:

> Pursuant to the U.S. Constitution, Article II, § 2, cl. 2, and 42 U.S.C. § 284(a), the Secretary of Health and Human Services has the authority to appoint Institute and Center Directors at the National Institutes of Health. Accordingly, in my capacity as Secretary, I have decided to terminate your appointment as the Director of the National Institute of Allergy and Infectious Disease [sic].

*See* Ex. B.

49.    On December 10, 2025, Dr. Marrazzo filed an addendum to her OSC whistleblower retaliation complaint alleging that Secretary Kennedy terminated her employment in retaliation for her protected activity, including the filing of her whistleblower retaliation complaint and disclosure with the OSC, and her statements to the media about matters affecting the public health and safety. *See* Ex. C.

20

50.     Dr. Marrazzo's termination was of considerable interest to the American public and garnered national media attention.  Benjamin Mueller, *Kennedy Fires N.I.H. Scientist Who Filed Whistle-Blower Complaint*, N.Y. TIMES (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/health/kennedy-marrazzo-nih.html; Ed Pilkington, *RFK Jr fires top NIH scientist weeks after she files whistleblower complaint*, THE GUARDIAN (Oct. 3, 2025), https://www.theguardian.com/us-news/2025/oct/03/rfk-jr-jeanne-marrazzo-nih-fired; Michael Kaplan, *RFK Jr. fires NIH vaccine whistleblower Dr. Jeanne Marrazzo*, CBS NEWS (Oct. 3, 2025), https://www.cbsnews.com/news/rfk-jr-fires-nih-vaccine-whistleblower-dr-jeanne-marrazzo/.

**LEGAL BACKGROUND AND BASIS FOR JURISDICTION BEFORE THIS COURT**

51.     Congress enacted the CSRA in 1978 in part to create a uniform scheme for administrative and judicial review of covered federal employee personnel actions by an independent body of experts insulated from political influence.  The CSRA establishes the protections and remedies available to such employees as well as the procedures they must follow to adjudicate their rights.

52.     The WPA amended the CSRA and established the OSC as an independent agency, headed by the Special Counsel, in order to strengthen whistleblower protections for federal employees.  The WPA prohibits agency officials from retaliating against a federal employee because the employee has disclosed information that they reasonably believe evidences "any violation of any law, rule, or regulation," or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety"  5 U.S.C. § 2302(b)(8); 5 U.S.C. § 2302(a)(2)(A); 5 CFR § 1800.2(a)(8).

53.     Allegations of prohibited personnel practices ("PPP"), including retaliation for whistleblowing, are brought to the OSC for investigation, while certain adverse actions, including terminations, may be appealed directly to the MSPB.  *See* 5 U.S.C. §§ 1211, 1212.

54.     If the Special Counsel determines that there are reasonable grounds to believe a PPP occurred, the OSC reports that determination to the MSPB and may request that the MSPB take corrective action.  *Id*. §§ 1214(b)(1)(A)(i), (b)(2)(B).

55.     Employees may appeal adverse actions, including a removal, also known as a termination, to the MSPB, where they have a right to a hearing before an administrative judge ("AJ"), who is an MSPB employee, pursuant to the procedures at 5 U.S.C. § 7701.  *See* 5 U.S.C. § 7512(1).

56.     If an employee is dissatisfied with the outcome of the hearing before the AJ, she may petition for a review by the full Board, 5 U.S.C § 7701(e)(1)(A), or appeal to the Court of Appeals for the Federal Circuit, 5 U.S.C. § 7703.

57.     The U.S. Supreme Court has previously concluded that the CSRA provides "the exclusive avenue to judicial review" for federal employment law claims.  *Elgin v. Dept. of Treas.*, 567 U.S. 1, 1 (2012).  However, that is no longer the case because "Congress intended for the Civil Service Reform Act to strip district courts of jurisdiction only if federal employees were otherwise able to receive adequate and independent review of their claims," and "the Civil Service Reform Act has been so undermined that the jurisdiction stripping scheme no longer controls."  *See Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F. 4th 293, 300 (4th Cir. 2025), *reh'g denied* No. 23-2235, 2025 WL 3240932 (4th Cir. Nov. 20, 2025), *mandate stayed Margolin v. Nat'l Ass'n of Immigr. Judges*, No. 25A662, 2025 WL 3493401 (U.S. Dec. 5, 2025).

58.     *Elgin* applied the Supreme Court's reasoning in *Thunder Basin Coal Co. v. Reich*, which established that whether a statute "preclude[s] initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims *can be afforded meaningful review*."  510 U.S. 200, 207 (1994) (emphasis added) (internal citation omitted).

59.     In the prior cases in which the Supreme Court has held that the CSRA precludes the invocation of federal question jurisdiction in the district courts, the Supreme Court has pointed to "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," in concluding that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court."  *Elgin*, 567 U.S. at 10–11; *see also United States v. Fausto*, 484 U.S. 439, 443 (1988) (the CSRA "prescribes in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review").  Since those decisions, however, key details of the CSRA have been altered.  In fact, the centerpiece of the CSRA has been nullified.

60.     Applying the *Thunder Basin* test, the CSRA's text, structure, purpose, and legislative history all indicate that Congress intended the OSC and MSPB to serve as independent agencies insulated from influence by the President and executive agencies.

61.     The Trump Administration has undermined the independence of the OSC and MSPB in direct contravention of the language, structure, purpose, and legislative history of the CSRA.

62.     First, the Trump Administration has taken the position that the President may remove the Special Counsel, MSPB members, and AJs without cause and has indeed removed

the Special Counsel and a member of the MSPB without cause.  *See Dellinger v. Bessent*, 768 F. Supp. 3d 33, 37 (D.D.C. 2025), *vacated and remanded*, No. 25-5052, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025) (challenging the removal of Special Counsel Hampton Dellinger); *Harris v. Bessent*, WL 3496737, at *3 (D.C. Cir. 2025) (upholding removal of MSPB member Cathy Harris).  The MSPB is no longer independent as Congress intended.

63.    There is currently no Senate-confirmed Special Counsel.  Mr. Jamieson Greer has served as Acting Special Counsel since April 2025 while holding the Senate-confirmed position of U.S. Trade Representative.  He also served concurrently as Acting Director of a third federal agency, the U.S. Office of Government Ethics, until August 26, 2025.  The MSPB currently has two Presidentially appointed, Senate-confirmed Board members.  Henry Kerner was sworn in as a Board member on June 3, 2024, and elevated to Acting Chairman by President Trump on March 4, 2025.  James Woodruff was sworn in as a Board member on October 28, 2025.  Both Board members are Republicans.  The third Board member position remains unfilled, with no nominee put forward yet by President Trump.

64.    Second, the Trump Administration has severely eroded the independence of the MSPB, AJs, and OSC by directing all members of the executive branch, including AJs and independent agencies, about how to construe federal law.  In Executive Order 14215 (Feb. 18, 2025), the President declared:

> The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law.

*Id.*, § 7.  The Order expressly applies to supposedly independent agencies such as the OSC and

MSPB.  *See id.* §§ 1, 2(b), 5.  The OLC has already informed MSPB judges that they must

follow the President's construction of the law and has directed judges in particular cases to do so.

65.     Implementing the Executive Order, DOJ's Office of Legal Counsel issued an

opinion concluding that the MSPB must consider constitutional issues, despite MSPB's own

precedent directing otherwise.  In litigation before the MSPB, the DOJ has asserted that the

MSPB is part of the Executive Branch and is therefore *required* to follow the guidance issued by

OLC.  *See* Agency's Motion for Leave to File Additional Pleading and Alternative Motion to

Remand, *Jackler v. Dep't of Justice*, No. DA-0752-25-0330-I-1 (MSPB Sept. 27, 2025).  This

strong-arming of MSPB AJs makes a mockery out of the independence of a hearing before the

MSPB and ensures that employees cannot get a fair hearing there.

66.     Following these directives, the MSPB is now dismissing "without prejudice" all

Article II removal cases for "administrative efficiency" while the "potentially dispositive issue"

is pending.  *See, e.g.*, *Ex-US Trustee Director's Firing Appeal Tossed for Now,* Law360 (Nov. 21,

2025), https://www.law360.com/articles/2414193/ex-us-trustee-director-s-firing-appeal-tossed-

for-now (citing *Twomey v. DOJ*, MSPB DC-0752-25-1950-I-1).  Such action on the part of the

MSPB forecloses the Plaintiff from meaningful judicial review under the CSRA.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. §§ 706(1) and 706(2)

67.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

66 above, inclusive.

68.     Defendants Kennedy and HHS, in authorizing and signing the issuance of the

Plaintiff's termination letter on September 26, 2025, implemented a final agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;"

"contrary to a constitutional right, power, privilege, or immunity;" "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of

procedure required by law."  5 U.S.C. § 706(2).

69.    Defendants' actions are arbitrary and capricious, and they are in contravention of

the rights, protections, and processes afforded to Plaintiff by the CSRA, Fifth Amendment, First

Amendment, and Whistleblower Protection Act.

70.    For these reasons, Plaintiff is entitled to reinstatement and backpay.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE CSRA, 5 U.S.C. § 7513**
**(*Ultra Vires* in Violation of Statutory Authority)**

71.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

70 above, inclusive.

72.    Defendants Kennedy and HHS had no lawful authority to terminate Plaintiff from

federal service without adhering to the statutory protections afforded to her under the CSRA, 5

U.S.C. § 7513.  Her termination was therefore *ultra vires* and without legal force or effect.

73.    As such, she is entitled to reinstatement and backpay.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE UNITED STATES CONSTITUTION**
**(Fifth Amendment Procedural Due Process, Property Interest)**

74.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

73 above, inclusive.

75.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution

guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process

of law."  Plaintiff has a protected property interest in her continued employment with NIH.

76.     Defendants' actions to terminate Plaintiff without due process unlawfully deprived her of that property interest.

77.     Plaintiff has suffered adverse and harmful effects from the deprivation of her property interests in her employment, including but not limited to loss of income.  As such, she is entitled to reinstatement and backpay.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE UNITED STATES CONSTITUTION**
**(First Amendment)**

78.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 77 above, inclusive.

79.     Dr. Marrazzo engaged in protected First Amendment activity when she filed complaints with the OSC reporting the retaliation against her after disclosing government misconduct.

80.     Dr. Marrazzo further engaged in protected First Amendment activity when she spoke to the media—including *The New York Times*, *The Washington Post*, CBS Evening News, STAT, and *The Atlantic*—about the government's retaliation against her and about actions taken by HHS and NIH regarding matters of public concerns.

81.     Dr. Marrazzo made these communications as a citizen speaking upon a matter of public concern.  She did not make these communications pursuant to her official duties as NIAID Director.

82.     Defendants terminated Dr. Marrazzo's employment because of her protected speech.

83.     As a result, Defendants violated Plaintiff's First Amendment rights, and Plaintiff is entitled to declaratory judgment.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT**
**(5  U.S.C. § 2302(b))**

84.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 83 above, inclusive.

85.     Plaintiff engaged in protected whistleblower activity under subsection (b)(8) of the WPA when she disclosed information that she reasonably believed evidenced a violation of a law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; and a substantial and specific danger to public health or safety; and scientific censorship.

86.     Plaintiff also engaged in protected activity under subsection (b)(9) of the WPA by filing PPP and Disclosure Complaints with the OSC.

87.     Plaintiff's protected disclosures contributed to Defendants removing her from her position, placing her on administrative leave, and terminating her employment.

88.     Because of Defendants' illegal retaliation against Plaintiff, Plaintiff is entitled to reinstatement and backpay.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(28 U.S.C. §§ 2201 and 2202)**

89.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 88 above, inclusive.

90.     Plaintiff is entitled to declaratory relief on the basis of all claims identified.  There is a substantial and ongoing controversy between Plaintiff and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants do not have authority to remove Plaintiff without affording her all rights and protections set forth by applicable statutes and regulations.

91.    Plaintiff has suffered adverse and harmful effects and is entitled to declaratory judgment.

### SEVENTH CAUSE OF ACTION
### WRIT OF MANDAMUS
### (28 U.S.C. § 1651(a))

92.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 91 above, inclusive.

93.    In the alternative, Plaintiff is entitled to a writ of mandamus commanding Defendants to return her to her office and not remove her from federal service without following lawful procedures.  Defendants have a legal duty not to terminate Plaintiff without affording her the protections prescribed by law and, absent this Court granting relief, there is no other adequate means of redress.

94.    The provisions of 28 U.S.C. § 1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

95.    To the extent relief is unavailable under either the APA, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Jeanne M. Marrazzo requests that the Court award her the following relief:

1) A declaration that Defendants' actions violated the Administrative Procedure Act;

2) A declaration that the Defendants' actions violated Plaintiff's Fifth Amendment due process rights;

3) A declaration that the Defendants' actions violated Plaintiff's First Amendment right to free speech;

4) A declaration that Defendants' actions violated Plaintiff's statutory rights under the CSRA and WPA;

5) An order requiring Defendants to immediately reinstate Plaintiff and enjoining Defendants from taking any further adverse personnel action against Plaintiff without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

6) An award of backpay and administrative relief as appropriate; and

7) Any and all other relief as the Court may deem just and proper.


Date: December 16, 2025                    Respectfully Submitted,

                                           /s/   _Debra S. Katz_____

                                           **KATZ BANKS KUMIN LLP**
                                           Debra S. Katz [D. Md. Bar No. 12626]
                                           Lisa J. Banks [D. Md. Bar No. 20183]
                                           Pamela J. Stone [MD Bar No. 1112150176]**
                                           Marilyn Gabriela Robb*
                                           11 Dupont Circle, NW, Suite 600
                                           Washington, D.C. 20036
                                           Tel: (202) 299-1140
                                           Katz@katzbanks.com
                                           Banks@katzbanks.com
                                           Stone@katzbanks.com
                                           Robb@katzbanks.com

                                           **LOWELL & ASSOCIATES, PLLC**
                                           Abbe David Lowell [D. Md. Bar No. 11863]
                                           Schuyler J. Standley*
                                           John P. Bolen [D. Md. Bar No. 31664]
                                           1250 H St., NW, Suite 250
                                           Washington, D.C. 20005

Tel: (202) 964-6110
ADLowell@lowellandassociates.com
Sstandley@lowellandassociates.com
Jbolen@lowellandassociates.com

*Pro hac vice* applications forthcoming
**Application for admission to D. Md. Bar currently pending

*Counsel for Plaintiff Jeanne M. Marrazzo*