# EXHIBIT A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

## PART 1: IMPORTANT INFORMATION ABOUT FILING A COMPLAINT

**Required Complaint Form.** Complaints alleging a prohibited personnel practice or a prohibited activity must be submitted on this form, either by e-filing or by mail. Information not submitted on or accompanied by this form may be returned by OSC to the filer. The complaint will be considered filed on the date on which OSC receives the completed form. 5 C.F.R. § 1800.1, as amended.

**No OSC Jurisdiction.** OSC cannot take any action on complaints filed by employees of

- the FBI, CIA, DIA, NSA, National Geospatial-Intelligence Agency, ODNI, National Reconnaissance Office or other intelligence agencies excluded from coverage by the President;
- the Government Accountability Office;
- the Postal Rate Commission; and
- the uniformed services of the United States (*i.e.*, uniformed military employees). OSC does have jurisdiction over civilian employees of the armed forces.

**Limited OSC Jurisdiction.** For employees of some federal agencies or entities, OSC's jurisdiction is limited to certain types of complaints, as follows –

- FAA employees only for allegations of retaliation for whistleblowing under 5 U.S.C. § 2302(b)(8) and most allegations of retaliation for engaging in protected activities under 5 U.S.C. § 2302(b)(9).
- employees of government corporations listed at 31 U.S.C. § 9101 only for allegations of retaliation for whistleblowing under 5 U.S.C. § 2302(b)(8) and most allegations of retaliation for engaging in protected activities under 5 U.S.C. § 2302 (b)(9).
- U.S. Postal Service employees only for allegations of nepotism.
- TSA employees only for allegations of discrimination under § 2302(b)(1), retaliation for whistleblowing under 5 U.S.C. § 2302(b)(8), and most allegations of retaliation for engaging in protected activities under 5 U.S.C. § 2302(b)(9).

**Election of Remedies.** You may choose only one of three possible methods to pursue your prohibited personnel practice complaint: (a) a complaint to OSC; (b) an appeal to the Merit Systems Protection Board (MSPB) (if the action is appealable under law or regulation); or (c) a grievance under a collective bargaining agreement. If you have already filed an appeal about your prohibited personnel practice allegations with the MSPB, or a grievance about those allegations under the collective bargaining agreement (if the action is grievable under the agreement), OSC may lack jurisdiction over your complaint. 5 U.S.C. § 7121(g).



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

**Complaints Involving Discrimination.**
- Race, Color, Religion, Sex, National Origin, Age, and Disability (or Handicapping Condition): OSC is authorized to investigate discrimination based upon race, color, religion, sex, national origin, age, or disability (or handicapping condition), as well as retaliation related to EEO activity. 5 U.S.C. § 2302(b)(1). However, OSC generally defers such allegations to agency procedures established under regulations issued by the Equal Employment Opportunity Commission (EEOC). 5 C.F.R. § 1810.1. If you wish to report allegations of discrimination based on these bases, you should contact your agency's EEO office immediately. There are specific time limits for filing such complaints. Filing a complaint with OSC will not relieve you of the obligation to file a complaint with the agency's EEO office within the time prescribed by EEOC regulations (at 29 C.F.R. Part 1614).
- Marital Status and Political Affiliation: OSC is authorized to investigate discrimination based on marital status or political affiliation. 5 U.S.C. § 2302(b)(1).
- Sexual Orientation and Gender Identity: OSC is authorized to investigate discrimination based on sexual orientation and gender identity. 5 U.S.C. §§ 2302(b)(1) and (b)(10). EEOC also may have jurisdiction over complaints of discrimination on these bases.

**Complaints Involving Veterans Rights.** By law, all complaints alleging denial of veterans' preference requirements or USERRA must be filed with the Veterans Employment and Training Service (VETS) at the Department of Labor (DOL). 38 U.S.C. § 4301, et seq., and 5 U.S.C. § 3330a(a).



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

**Select your PPPs**

Biographical Information

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## PART 2: SELECT YOUR PPPs

Please check **ALL** that apply (you MUST check one option). A customized series of questions will appear following the "Biographical Information" section, below, based on your selections. You can return to this part at any time prior to submitting your complaint if you would like to add or remove allegations. All fields allow ample space to respond, but each question has a character limit; if you can no longer type you have hit the limit.

### RETALIATION CLAIMS

☑ *Retaliation for Whistleblowing*
Retaliation for reporting a violation of law, rule, or regulation; gross mismanagement; gross waste of funds; abuse of authority; a substantial and specific danger to public health or safety; or censorship related to scientific research.

☑ *Retaliation for Protected Activity*
Retaliation for filing a complaint or grievance; assisting another with a complaint or grievance; cooperating with an OSC, OIG, or internal investigation; or refusing to obey an illegal order.

### ILLEGAL SELECTION PRACTICE CLAIMS

☐ *Obstruct Competition*
Intentionally deceive or obstruct anyone from competing for federal employment.

☐ *Give Unauthorized Preference*
Give an unauthorized preference or advantage, including defining the manner or scope of competition, to improve or injure the employment prospects of any person.

☐ *Encourage Withdrawal from Competition*
• Influence or encourage anyone to withdraw from competition to improve or injure the employment prospects of any person.

☐ *Nepotism*
Involvement in the appointment, promotion, or advancement of a relative, or advocacy on behalf of a relative.

☐ *Improper Political Recommendation*
Request or consider a recommendation based on political connections or influence rather than one based on personal knowledge of a person's ability to perform a job.

☐ *Violate Veterans' Preference*
Take or fail to take, recommend, or approve a personnel action if doing so would violate a veterans' preference requirement. This type of complaint must be filed with the Department of Labor. Please click here to go to that site.

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

**Select your PPPs**

Biographical Information

Your Complaint

    Retaliation for Whistleblowing

    Retaliation for Protected Activity

    Obstruct Competition

    Give Unauthorized Preference

    Encourage Withdrawal from Competition

    Nepotism

    Improper Political Recommendation

    Violate Veterans' Preference

    Discrimination for Non-Job-Related Conduct

    Other Bases of Discrimination

    Improper Personnel Actions

    Non-Disclosure Agreement

    Improper Accessing of Medical Records

    Coerce Political Activity

    Other

Attachments

Consent

Certification

## DISCRIMINATION CLAIMS

☐ *Discrimination for Non-Job-Related Conduct*
Discrimination for conduct that does not adversely affect job performance, including claims of sexual orientation or gender identity discrimination.

☐ *Other Bases of Discrimination*
OSC examines claims of discrimination based on **marital status** and **political affiliation.** OSC does <u>NOT</u> ordinarily investigate claims of discrimination based on race, color, religion, sex, national origin, age, and handicapping condition. These claims are typically better filed with an agency's EEO office.

## OTHER CLAIMS

☐ *Improper Personnel Actions*
Take or fail to take a personnel action if doing so would violate any law, rule, or regulation implementing or directly concerning a merit system principle.

☐ *Non-Disclosure Agreement*
Implement or enforce a non-disclosure agreement or policy that lacks notification of whistleblower rights.

☐ *Improper Accessing of Medical Records*
Accessing the medical records of another employee or applicant for employment as a part of, or otherwise in furtherance of, the commission of a prohibited personnel practice.

☐ *Coerce Political Activity*
Coerce a person to engage in political activity, to include providing a political contribution or service, or take action against a person for doing so.

☐ *Other*
Please use this area to describe employment problems that do not fall into one of the categories listed above.

 **COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

---

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

**Biographical Information**

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

## PART 3: BIOGRAPHICAL INFORMATION

### * Denotes Required Fields

1. Complainant Information:

Title    Dr.

First Name* Jeanne          Middle Initial

Last Name* Marrazzo

2. Contact Information:

Address Location* ☑ Domestic  ☐ International

Address Line 1* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Address Line 2

City* ▮▮▮▮▮▮▮▮▮▮          State* ▮▮▮▮▮▮

Zip Code* ▮▮▮▮▮▮▮

Cell Phone Number ▮▮▮▮▮▮▮▮▮▮

Office Phone Number _____ Ext. _____

Home Phone Number _____

Email Address* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Preferred means of contact:

☑ email  ☐ home phone  ☐ cell phone  ☐ office phone

☐ Please do not contact me on my office phone

3. Do you have representation?* ☑ Yes  ☐ No

Title

First Name* Debra          Middle Initial S.

Last Name* Katz

Address Location* ☑ Domestic  ☐ International

Address Line 1* Katz Banks Kumin

Address Line 2  11 Dupont Circle NW, Suite 600

City* Washington          State* DC

Zip Code* 20036

*At least **ONE** phone number **OR** email address is required.

Cell Phone Number

Office Phone Number  (202) 299-1140  Ext.

---



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
| --- | --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

**Biographical Information**

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

Home Phone Number _____

Email Address  katz@katzbanks.com

Preferred means of contact:

[✓] email   [ ] home phone   [ ] cell phone   [ ] office phone

4. Complainant's employment status:*

[ ] Current Federal Employee

[✓] Former Federal Employee

[ ] Applicant For Federal Employment

[ ] Non-Federal Employee *(please specify below)*

5. If current or former federal employee, please list most recent position title, series, grade:

Title (for instance, Investigator)   Director

Series (for instance, GS-1810) _____

Grade (for instance, GS-9) _____

6. Please provide your dates of employment in this position. 9/23/23-4/1/25

7. Department name:*  Department of Health and Human Services

8. Agency name:*  National Institute of Health

9. Agency subcomponent:  National Institute of Allergy and Infectious Diseases

10. Street Address:  5601 Fishers Lane

11. City:*  Rockville

12. State:*  MD   [ ] Check here if agency address is international.

13. Zip Code:  20852

14. Are you covered by a collective bargaining agreement? *(Check one.)*

[ ] Yes   [✓] No   [ ] I don't know

15. Which of the following apply to your employment status? *(Check all applicable items.)*

a. Competitive Service

[ ] Temporary appointment      [ ] Career or career-conditional appointment

[ ] Term appointment            [ ] Probationary employee

OMB No. 3255-0005
Expires 02/26/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

**Biographical Information**

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

b. Excepted Service
- ☐ Schedule A
- ☐ National Guard Technician
- ☐ Tennessee Valley Authority
- ☑ Other *(specify)*: Title 42
- ☐ Schedule B
- ☐ Postal Service
- ☐ Non-appropriated fund
- ☐ Schedule C

c. Senior Executive Service (SES) or Executive Level
- ☐ Career SES
- ☐ Non-career SES
- ☐ Executive Level V or above
- ☐ Presidential appointee (Senate-confirmed)

d. Other
- ☐ Civil service annuitant
- ☐ Former civil service employee
- ☐ Unknown
- ☐ Military officer or enlisted person
- ☐ Contract employee
- ☐ Other *(specify)*:

16. What other action(s), if any, have you taken to appeal, grieve, or report this matter under any other procedure? *(Check all that apply.)*

- ☑ None, or not applicable
- ☐ Appeal with Merit Systems Protection Board (MSPB)    Date:
- ☐ Grievance under collective bargaining agreement procedure    Date:
- ☐ Grievance filed under agency grievance procedure    Date:
- ☐ Discrimination complaint filed with agency    Date:
- ☐ USERRA claim with VETS (Department of Labor)    Date:
- ☐ Appeal filed with Office of Personnel Management    Date:
- ☐ Lawsuit filed in Federal Court    Date:
  Court name:
- ☐ Reported matter to agency Inspector General    Date:
- ☐ Reported matter to member of Congress    Date:
  Name of Senator or Representative:
- ☐ Other *(specify)*:    Date:

17. What action would you like for OSC to take if we find that a prohibited personnel practice has occurred?

> I would like to be reinstated to my position.



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## PART 4: DETAILS OF YOUR COMPLAINT

### Retaliation for Whistleblowing

An agency official is prohibited from taking, failing to take, or threatening to take or fail to take, a personnel action against an employee or applicant because the individual made a disclosure of information that s/he reasonably believed evidenced wrongdoing (*i.e.*, a violation of any law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; substantial and specific danger to public health or safety; or censorship related to scientific research.) 5 U.S.C. § 2302(b)(8). This is commonly referred to as a retaliation for whistleblowing claim.

---

***IMPORTANT INFORMATION ABOUT RETALIATION ALLEGATIONS***

**YOU SHOULD LIST ALL DISCLOSURES AND PERSONNEL ACTIONS INVOLVED IN YOUR COMPLAINT.** This is because: (1) failure to list any disclosure or personnel action may delay the processing of your complaint by OSC; and (2) a comprehensive listing will help avoid disputes in any later Individual Right of Action (IRA) appeal that you may file with the Merit Systems Protection Board (MSPB).

You may add additional allegations of retaliation for whistleblowing to this complaint while it is pending at OSC. Submission of any additional allegations to OSC in writing will help you if you later decide to file an IRA appeal with the MSPB.

To establish its jurisdiction over an IRA appeal, the MSPB will require you to show that your IRA appeal relates to the same disclosure(s) and personnel action(s) raised in your complaint to OSC. The following documents will help meet this requirement: a copy of the retaliation allegations in your complaint, any additional allegation(s) of retaliation that you submitted to OSC in writing while the complaint was pending, and any official correspondence you receive from OSC about your complaint. **IT IS IMPORTANT, THEREFORE, THAT YOU SAVE COPIES OF ALL THESE DOCUMENTS FOR YOUR RECORDS.**

If OSC fails to complete its review of your whistleblower retaliation allegation within 120 days after it receives your complaint, or if it closes your complaint at any time without seeking corrective action on your behalf, you have the right to file an IRA appeal with the MSPB. 5 U.S.C. § 1214(a)(3).

---

Please *briefly* answer the following questions about your retaliation claim.



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|
| **Prohibited Personnel Practices (PPP)** | 1. What did you disclose? If you made your disclosure in writing, please attach copies of this page to your complaint before you mailing it. |
| About Filing a Complaint | |
| Select your PPPs | See addendum. |
| Biographical Information | |
| **Your Complaint** | |
| **Retaliation for Whistleblowing** | |
| Retaliation for Protected Activity | |
| Obstruct Competition | |
| Give Unauthorized Preference | |
| Encourage Withdrawal from Competition | |
| Nepotism | |
| Improper Political Recommendation | |
| Violate Veterans' Preference | |
| Discrimination for Non-Job-Related Conduct | |
| Other Bases of Discrimination | |
| Improper Personnel Actions | |
| Non-Disclosure Agreement | |
| Improper Accessing of Medical Records | |
| Coerce Political Activity | |
| Other | |
| Attachments | |
| Consent | |
| Certification | |



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| **Navigation Bar** |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

2. When did you disclose it?

See addendum.

3. To whom did you make your disclosure?

See addendum.

4. How did you learn of the information you disclosed?

See addendum.

5. When and how did agency officials learn about your disclosure?

See addendum.



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   **Retaliation for Whistleblowing**

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

6. What action did the agency take in response to your disclosure? (For example, did the agency investigate or otherwise look into what you disclosed or was disciplinary action taken against responsible parties?)

> Agency officials removed my from my position, placed me on administrative leave, and pretextually offered me reassignment.

7. What personnel action(s) do you believe was taken, not taken, or threatened because of your disclosure?
Check all applicable:

| | |
| --- | --- |
| ☑ Removal | ☐ Reinstatement |
| ☐ Suspension | ☑ Reassignment |
| ☐ Other Discipline | ☐ Harassment/Hostile Work Environment |
| ☐ VA Expedited Process | ☐ Psychiatric Examination |
| ☐ Gag Order | ☐ Performance Evaluation |
| ☐ Detail | ☑ Changes to Duties/Working Conditions |
| ☐ Promotion | ☐ Pay, Benefits, Training |
| ☐ Appointment | ☑ Other |

Describe:

> Agency officials removed my from my position, placed me on administrative leave, and pretextually offered me reassignment.



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
| --- | --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

**Retaliation for Whistleblowing**

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

8. When was the personnel action(s) taken? By whom?

> I was removed from my position and placed on administrative leave effective April 1, 2025.

9. What was the agency's stated reason for taking the personnel action(s)?

> The agency stated that it would reassign me to the Indian Health Service because of that agency's "untenable vacancy rate." However, I was never reassigned.

10. What facts demonstrate that the personnel action(s) is retaliatory? (For example, were comments made that suggest that agency officials were angry because of your disclosure or did your relationships cool following your disclosure?)

> See addendum.



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   **Retaliation for Protected Activity**

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

11. Why do you believe agency officials would retaliate against you? (For example, did agency officials suffer some adverse impact or embarrassment because of your disclosure?)

> See addendum.

12. Please provide the name, title, and position in your chain of command of the agency official(s) involved in taking the personnel action(s) that you believe was retaliatory.

| First Name | Last Name | Title (*e.g.*, Deputy Director) | Chain of Command (*e.g.*, 1st level supervisor) |
|---|---|---|---|
| Dr. Matthew | Memoli | Former Acting NIH Director; NIH Principal Deputy Director | 1st Level Supervisor |
| | | | |
| | | | |

13. Were the agency officials involved in taking the personnel actions against you accused of wrongdoing in your disclosures? If yes, which ones?

> See addendum.

## Retaliation for Protected Activity

An agency official is prohibited from taking, failing to take, or threatening to take or fail to take a personnel action against any employee or applicant for federal employment because of (A) the exercise of an appeal, complaint, or grievance right granted by any law, rule or regulation; (B) testifying or otherwise lawfully assisting any individual in the exercise of any such right; (C) cooperating with or disclosing information to the Inspector General (or any other component responsible for internal investigation or review) of any agency, or the Special Counsel; or (D) refusing to obey an order that would require the individual to violate a law, rule, or regulation.

5 U.S.C. § 2302(b)(9).



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

**Retaliation for Protected Activity**

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

***IMPORTANT INFORMATION ABOUT RETALIATION ALLEGATIONS***

**YOU SHOULD LIST ALL PROTECTED ACTIVITIES AND PERSONNEL ACTIONS INVOLVED IN YOUR COMPLAINT.** This is because: (1) failure to list any protected activity or personnel action may delay the processing of your complaint by OSC; and (2) a comprehensive listing will help avoid disputes in any later Individual Right of Action (IRA) appeal that you may file with the Merit Systems Protection Board (MSPB).

You may add additional allegations of retaliation for engaging in protected activities to this complaint while it is pending at OSC. Submission of any additional allegations to OSC <u>in</u> writing will help you if you later decide to file an IRA appeal with the MSPB.

To establish its jurisdiction over an IRA appeal, the MSPB will require you to show that your IRA appeal relates to the same protected activities and personnel action(s) raised in your complaint to OSC. The following documents will help meet this requirement: <u>a copy of the retaliation allegations in your complaint, any additional allegation(s) of retaliation that you submitted to OSC in writing while the complaint was pending, and any official correspondence you receive from OSC about your complaint.</u> **IT IS IMPORTANT, THEREFORE, THAT YOU SAVE COPIES OF ALL THESE DOCUMENTS FOR YOUR RECORDS.**

If OSC fails to complete its review of your retaliation allegation within 120 days after it receives your complaint, or if it closes your complaint at any time without seeking corrective action on your behalf, you have the right to file an IRA appeal with the MSPB. 5 U.S.C. § 1214(a)(3).

Please briefly answer the following questions about your retaliation claim.

1. In what protected activity did you engage?

☐ Filed a complaint, appeal, or grievance
☐ Testified for or lawfully assisted an individual in the exercise of their right to file a complaint, appeal, or grievance
☐ Cooperated with or disclosed information to an Inspector General, OSC, or other investigator
☐ Refused to obey an order that would require you to violate a law, rule, or regulation
☑ Other

2. When did you engage in the protected activity?

See addendum.



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

  Retaliation for Whistleblowing

  **Retaliation for Protected Activity**

  Obstruct Competition

  Give Unauthorized Preference

  Encourage Withdrawal from Competition

  Nepotism

  Improper Political Recommendation

  Violate Veterans' Preference

  Discrimination for Non-Job-Related Conduct

  Other Bases of Discrimination

  Improper Personnel Actions

  Non-Disclosure Agreement

  Improper Accessing of Medical Records

  Coerce Political Activity

  Other

Attachments

Consent

Certification

3. Please briefly describe the nature of your protected activity.

See addendum.

4. What action did the agency take in response to your protected activity? (For example, did the agency investigate or otherwise look into what you disclosed or was disciplinary action taken against responsible agency officials?)

Agency officials removed my from my position, placed me on administrative leave, and pretextually offered me reassignment.



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

**Retaliation for Protected Activity**

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

5. When and how did agency officials learn about your protected activity?

See addendum.

6. What personnel action(s) do you believe was taken, not taken, or threatened because of your disclosure?
Check all applicable:

- ☑ Removal
- ☐ Suspension
- ☐ Other Discipline
- ☐ VA Expedited Process
- ☐ Gag Order
- ☐ Detail
- ☐ Promotion
- ☐ Appointment

- ☐ Reinstatement
- ☑ Reassignment
- ☐ Harassment/Hostile Work Environment
- ☐ Psychiatric Examination
- ☐ Performance Evaluation
- ☑ Changes to Duties/Working Conditions
- ☐ Pay, Benefits, Training
- ☑ Other

Describe:

Agency officials removed my from my position, placed me on administrative leave, and pretextually offered me reassignment.

OMB No. 3255-0005
Expires 02/28/2026



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

    Retaliation for Whistleblowing

    **Retaliation for Protected Activity**

    Obstruct Competition

    Give Unauthorized Preference

    Encourage Withdrawal from Competition

    Nepotism

    Improper Political Recommendation

    Violate Veterans' Preference

    Discrimination for Non-Job-Related Conduct

    Other Bases of Discrimination

    Improper Personnel Actions

    Non-Disclosure Agreement

    Improper Accessing of Medical Records

    Coerce Political Activity

    Other

Attachments

Consent

Certification

7. When was the personnel action(s) taken? By whom?

See addendum.

8. What was the agency's stated reason for taking the personnel action(s)?

The agency stated that it would reassign me to the Indian Health Service because of that agency's "untenable vacancy rate." However, I was never reassigned.



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   **Retaliation for Protected Activity**

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

9. What facts demonstrate that the personnel action(s) is retaliatory? (For example, were comments made that suggest that agency officials were angry because of your protected activity or did your relationships cool following your actions?)

See addendum.

10. Why do you believe agency officials would retaliate against you? (For example, did agency officials suffer some adverse impact or embarrassment because of your protected activity?)

See addendum.



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

**Retaliation for Protected Activity**

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

11. Please provide the name, title, and position in your chain of command of the agency official(s) involved in taking the personnel action(s) that you believe were retaliatory.

| First Name | Last Name | Title (e.g., Deputy Director) | Chain of Command (e.g., 1st level supervisor) |
|---|---|---|---|
| Dr. Matthew | Memoli | Former Acting NIH Director; NIH Principal Deputy Director | 1st Level Supervisor |
| | | | |
| | | | |

12. Were the agency officials involved in taking the personnel action(s) against you accused of wrongdoing in your complaint or other protected activity? If yes, which ones?

See addendum.



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

**Obstruct Competition**

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## Obstructed Competition

An agency official is prohibited from deceiving or willfully obstructing an individual from competing for federal employment. 5 U.S.C. § 2302(b)(4) This section requires evidence that the agency official willfully engaged in actions to prevent or otherwise adversely affect an individual from being considered for a position. A mistake, oversight, or error is not a prohibited personnel practice. Likewise, the selection of a qualified candidate who, at the outset of the competition, was the preferred candidate (*i.e.*, "pre-selection") does not automatically constitute a willful obstruction of one's right to compete.

Please briefly answer the following questions about your claim of willful obstruction.

1. State the series, grade, and title of the position for which you were competing, if applicable.

   N/A

2. How was the position filled (*e.g.*, vacancy announcement, detail, reassignment)?

   N/A

3. Was the position in the competitive or excepted service?
   ☐ Competitive Service    ☐ Excepted Service
4. Was the position advertised?  ☐ Yes    ☐ No
5. How was this position advertised? *(Check all that apply.)*
   ☐ Externally    ☐ Internally
6. Did you apply for the position?  ☐ Yes    ☐ No
7. State the name and title of the agency official(s) who deceived or obstructed you from competing for federal employment.

| First Name | Last Name | Title (*e.g.*, Deputy Director) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|
| **Prohibited Personnel Practices (PPP)** | 8. State how the involved agency official(s) deceived or obstructed you from competing for federal employment. (For example, what did he/she say or do to obstruct you from competing?) |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   **Obstruct Competition**

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

8. State how the involved agency official(s) deceived or obstructed you from competing for federal employment. (For example, what did he/she say or do to obstruct you from competing?)

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   **Obstruct Competition**

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

9. Why do you believe the identified agency official(s) wanted to obstruct your right to compete?

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

**Give Unauthorized Preference**

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## Give Unauthorized Preference

An agency official is prohibited from granting an unauthorized preference or advantage to any employee or applicant for the purpose of improving or injuring the prospects of any particular person for employment. 5 U.S.C. § 2302(b)(6). Please note that the selection of a qualified candidate who, at the outset of the competition, was the preferred candidate (*i.e.*, "pre-selection") does not alone constitute an unauthorized preference or advantage.

Please _briefly_ answer the following questions about your unauthorized preference or advantage claim.

1. Please state the job title, series, and grade of the position for which an unauthorized preference or advantage was granted.

   N/A

2. How was the position filled (*e.g.*, vacancy announcement, detail, reassignment)?

   N/A

3. Was the position in the competitive or excepted service?

   ☐ Competitive Service   ☐ Excepted Service

4. Was the position advertised?   ☐ Yes   ☐ No

5. How was this position advertised? *(Check all that apply.)*

   ☐ Externally   ☐ Internally   ☐ N/A

6. State the name and title of the agency official(s) who granted the unauthorized preference or advantage.

| First Name | Last Name | Title (*e.g.*, Deputy Director) |
|---|---|---|
| | | |
| | | |
| | | |



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

**Give Unauthorized Preference**

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

7. State the name, title, and position (if applicable) of the person who received the unauthorized preference or advantage.

N/A

8. How did the involved agency official(s) advantage this person? (For example, what specific actions did the agency official take to improve the employment prospects of this person?)

N/A



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

**Give Unauthorized Preference**

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

9.  What motivated the agency official to advantage this person?

N/A

10. What facts indicate that the involved agency official(s) granted the unauthorized preference or advantage *for the purpose* of improving this person's chances of being selected?

N/A

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

**Give Unauthorized Preference**

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

11. If you believe the person selected was not qualified for the position, which of the required qualification(s) does the individual lack? How do you know the individual does not meet the requirement(s)?

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

**Encourage Withdrawal from Competition**

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## Encourage Withdrawal from Competition

An agency official is prohibited from influencing, or trying to influence, an individual to withdraw from competition for any position for the purpose of improving or injuring the prospects of any other person for employment. 5 U.S.C. § 2302(b)(5).

Please _briefly_ answer the following questions about your claim concerning improper influence.

1. State the series, grade, and title of the position for which you were competing.

> N/A

2. How was the position filled (_e.g._, vacancy announcement, detail, reassignment)?

> N/A

3. Was the position in the competitive or excepted service?
   ☐ Competitive Service   ☐ Excepted Service

4. Was the position advertised?   ☐ Yes   ☐ No

5. How was this position advertised? _(Check all that apply.)_
   ☐ Externally   ☐ Internally

6. Did you apply for the position?   ☐ Yes   ☐ No

7. State the name and title of the agency official(s) who influenced, or tried to influence, you to withdraw from competition.

| First Name | Last Name | Title (_e.g._, Deputy Director) |
|---|---|---|
| | | |
| | | |
| | | |



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
| --- | --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   **Encourage Withdrawal from Competition**

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

8. State how the involved agency official(s) influenced, or tried to influence, you to withdraw from competition.

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

**Nepotism**

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## Nepotism

A public official is prohibited from engaging in nepotism (*i.e.*, hiring, promoting, advancing, or advocating for the appointment, employment, promotion, or advancement of any relative). 5 U.S.C. 2302(b)(7) The word "relative," means a father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother, or half-sister. 5 U.S.C. § 3110(a)(3).

Please briefly answer the following questions about your nepotism claim.

1. State the name and title of the public official(s) who engaged in nepotism.

| First Name | Last Name | Title (*e.g.*, Deputy Director) |
| --- | --- | --- |
| | | |
| | | |
| | | |

2. Identify the relative for whom the official acted or advocated.

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

**Nepotism**

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

3.  How is the public official related to the person for whom s/he acted or advocated? How do you know that they are related?

N/A

4.  When and how did the public official play a part in appointing, employing, promoting, advancing, or advocating for his/her relative?

N/A

5.  To your knowledge, has anyone previously alleged nepotism based on the relationship between this public official and his/her relative?

☐ Yes    ☐ No

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

---

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

**Improper Political Recommendation**

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

### Improper Political Recommendation

An agency official is prohibited from soliciting or considering any employment recommendation or statement, unless it is based on personal knowledge. 5 U.S.C. § 2302(b)(2)This section is intended to prevent the use of *political* influence to obtain a position or promotion.

Please briefly answer the following questions about your claim of an improper recommendation.

1. Describe the employment recommendation that was solicited or considered. (For example, for what employment opportunity was it solicited or considered? When was it issued? Who was the beneficiary or intended beneficiary of the recommendation?)

N/A



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | 2. How did you learn about the solicitation or consideration of the recommendation? |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

**Improper Political Recommendation**

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

N/A

3. State the name and title of the agency official(s) who solicited or considered the recommendation.

| First Name | Last Name | Title (*e.g.*, Deputy Director) |
|---|---|---|
| | | |
| | | |
| | | |



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

**Improper Political Recommendation**

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

4. Was the recommendation received from a member of Congress? If so, (a) please identify the member of Congress, and (b) describe the nature of the recommendation.

N/A

5. If an employment recommendation was made, was it based on the personal knowledge of the person who made it? For example, was the recommendation based on observations derived from an employment relationship?

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
| --- | --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

**Improper Political Recommendation**

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

6. If you believe that an employment recommendation was not based on the personal knowledge of the person who made it, please describe the facts supporting your belief.

N/A



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

---

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

**Violate Veterans' Preference**

**Discrimination for Non-Job-Related Conduct**

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

---

## Violation of Veterans' Preference

An agency official is prohibited from taking or failing to take a personnel action if doing so would violate veterans' preference. 5 U.S.C. § 2302(b)(11) While such actions constitute a prohibited personnel practice, generally, employees must file these claims through the Department of Labor. More information on filing these complaints with DOL can be found on their website.

## Discrimination for Non-Job-Related Conduct

An agency official is prohibited from discriminating against an employee or applicant on the basis of conduct that does not adversely affect the performance of the employee or applicant, or the performance of others. 5 U.S.C. § 2302(b)(10) This could include, for example, discrimination based on sexual orientation or gender identity.

Please briefly answer the following questions about your discrimination claim to help OSC determine whether there is sufficient information to warrant further inquiry into this allegation..

1. For what conduct do you believe you have faced discrimination?

N/A

2. Does your conduct involve your sexual orientation?  ☐ Yes ☐ No
3. Does your conduct involve your gender identity?  ☐ Yes ☐ No

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

**Discrimination for Non-Job-Related Conduct**

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

4. When and where did you engage in this conduct? (For example, did it occur before/ after duty hours, away from work?)

N/A

5. State the name, title, and position in your chain of command of the agency official(s) who discriminated against you based on your conduct.

| First Name | Last Name | Title (e.g., Deputy Director) | Chain of Command (e.g., 1st level supervisor) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

OMB No. 3255-0005
Expires 02/28/2026



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

**Discrimination for Non-Job-Related Conduct**

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

6.  If you know, state when and how the agency official(s) learned of your conduct.

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

**Discrimination for Non-Job-Related Conduct**

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

7. State how the agency official(s) discriminated against you based on your conduct. Check all applicable:

☐ Removal  ☐ Reinstatement

☐ Suspension  ☐ Reassignment

☐ Other Discipline  ☐ Harassment/Hostile Work Environment

☐ VA Expedited Process  ☐ Psychiatric Examination

☐ Gag Order  ☐ Performance Evaluation

☐ Detail  ☐ Changes to Duties/Working Conditions

☐ Promotion  ☐ Pay, Benefits, Training

☐ Appointment  ☐ Other

Describe:

N/A



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

**Discrimination for Non-Job-Related Conduct**

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

8. What facts indicate that the involved agency official(s) discriminated against you based on your conduct? (For example, did the agency official(s) make negative comments about your conduct? Were other employees who did not engage in such conduct treated differently from you?)

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

**Other Bases of Discrimination**

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

## Other Bases of Discrimination

*(Based on Race, Color, Religion, Sex, National Origin, Age, Disability, Marital Status, or Political Affiliation)*

An agency official is prohibited from discriminating for or against any employee or applicant for employment on the basis of race, color, religion, sex, national origin, age, disability (or handicapping condition), marital status or political affiliation. 5 U.S.C. § 2302(b)(1) OSC routinely examines claims of discrimination based on **marital status** and **political affiliation**. However, we defer nearly all claims of discrimination based on race, color, religion, sex, national origin, age, disability (or handicapping condition) to the EEO process. Filing an OSC complaint based upon one of these bases will not change the deadlines for filing an EEO complaint. While allegations of sexual orientation and gender identity discrimination are also sex discrimination, **OSC also examines these allegations as complaints of Discrimination for Non-Job-Related Conduct**. **If you are making an allegation of sexual orientation or gender identity discrimination, please complete the questions for that section.**

Please briefly answer the following questions about your discrimination claim.

1. What is the basis of your discrimination claim?

☐ Race         ☐ National Origin
☐ Color        ☐ Age
☐ Religion      ☐ Marital Status
☐ Sex          ☐ Political Affiliation
☐ Disability (or handicapping condition)

2. What is your status within that basis? (For example, if you are claiming marital status discrimination, are you married, single, widowed, or separated?)

N/A



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

**Other Bases of Discrimination**

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

3. What action(s) did the agency take or fail to take?
Check all applicable:

☐ Removal      ☐ Reinstatement

☐ Suspension      ☐ Reassignment

☐ Other Discipline      ☐ Harassment/Hostile Work Environment

☐ VA Expedited Process      ☐ Psychiatric Examination

☐ Gag Order      ☐ Performance Evaluation

☐ Detail      ☐ Changes to Duties/Working Conditions

☐ Promotion      ☐ Pay, Benefits, Training

☐ Appointment      ☐ Other

Describe:

N/A

OMB No. 3255-0005
Expires 02/28/2026



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

**Other Bases of Discrimination**

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

4  When did the action(s) occur?

N/A

5. State the name, title, and position in your chain of command of the agency official(s) involved in the action(s).

| First Name | Last Name | Title (e.g., Deputy Director) | Chain of Command (e.g., 1st level supervisor) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | 6. What was the agency's stated reason(s) for the action(s)? |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

**Other Bases of Discrimination**

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | 7. What facts support your assertion that the action was discriminatory? |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

**Other Bases of Discrimination**

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

## Improper Personnel Actions

An agency official is prohibited from taking or failing to take a personnel action if doing so results in the violation of a law, rule, or regulation that implements, or directly concerns, a merit system principle listed in 5 U.S.C. § 2301. 5 U.S.C. § 2302(b)(12) Retaliation for petitioning a member of Congress or exercising your First Amendment rights falls under this section.

Please briefly answer the following questions about your claim under this section.

1. What was the personnel action(s) taken or not taken? Check all applicable:

☐ Removal            ☐ Reinstatement

☐ Suspension        ☐ Reassignment

☐ Other Discipline    ☐ Harassment/Hostile Work Environment

☐ VA Expedited Process    ☐ Psychiatric Examination

☐ Gag Order          ☐ Performance Evaluation

☐ Detail              ☐ Changes to Duties/Working Conditions

☐ Promotion         ☐ Pay, Benefits, Training

☐ Appointment      ☐ Other

Describe:

N/A



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|
| **Prohibited Personnel Practices (PPP)** | |
| About Filing a Complaint | |
| Select your PPPs | |
| Biographical Information | |
| Your Complaint | |
| Retaliation for Whistleblowing | |
| Retaliation for Protected Activity | |
| Obstruct Competition | |
| Give Unauthorized Preference | |
| Encourage Withdrawal from Competition | |
| Nepotism | |
| Improper Political Recommendation | |
| Violate Veterans' Preference | |
| Discrimination for Non-Job-Related Conduct | |
| Other Bases of Discrimination | |
| **Improper Personnel Actions** | |
| Non-Disclosure Agreement | |
| Improper Accessing of Medical Records | |
| Coerce Political Activity | |
| Other | |
| Attachments | |
| Consent | |
| Certification | |

2. When was the personnel action(s) taken or not taken?

N/A

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

## Navigation Bar

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   **Improper Personnel Actions**

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

---

3. State the name, title, and position in your chain of command of the agency official(s) involved in the personnel action(s).

| First Name | Last Name | Title (e.g., Deputy Director) | Chain of Command (e.g., 1st level supervisor) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

4. Describe the role played by each agency official listed above in the personnel action(s) that is the subject of your complaint. (e.g., recommending official, proposing official, deciding official, approving official, etc.).

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   **Improper Personnel Actions**

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

5. What law, rule, or regulation was violated by the agency's taking or failing to take the personnel action(s)?

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

**Non-Disclosure Agreement**

Improper Accessing of Medical Records

Coerce Political Activity

Other

Attachments

Consent

Certification

### <u>Non-Disclosure Agreement</u>

An agency official is prohibited from implementing or enforcing a non-disclosure policy, form, or agreement (commonly called a "gag order") if it does not contain a statement notifying employees and applicants for federal employment of their rights, obligations, and liabilities concerning classified information, communications to Congress, whistleblowing to an Inspector General, or any other whistleblower protection. 5 U.S.C. § 2302(b)(13).

Please <u>briefly</u> answer the following questions about this claim.

1. Describe the non-disclosure policy or "gag order."

N/A

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

　Retaliation for Whistleblowing

　Retaliation for Protected Activity

　Obstruct Competition

　Give Unauthorized Preference

　Encourage Withdrawal from Competition

　Nepotism

　Improper Political Recommendation

　Violate Veterans' Preference

　Discrimination for Non-Job-Related Conduct

　Other Bases of Discrimination

　Improper Personnel Actions

　**Non-Disclosure Agreement**

　Improper Accessing of Medical Records

　Coerce Political Activity

　Other

Attachments

Consent

Certification

2. State the name, title, and position in your chain of command of the agency official(s) who implemented or enforced the non-disclosure agreement or policy.

| First Name | Last Name | Title (e.g., Deputy Director) | Chain of Command (e.g., 1st level supervisor) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

3. When was the agreement or policy issued?

N/A

OMB No. 3255-0005
Expires 02/28/2026



# COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

## Navigation Bar

### Prohibited Personnel Practices (PPP)

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   **Non-Disclosure Agreement**

   Improper Accessing of Medical Records

   Coerce Political Activity

   Other

Attachments

Consent

Certification

4. To whom does the agreement or policy apply (*i.e.*, does the agreement apply only to you, to the subordinates of a particular agency official(s), to a field office, or to the entire agency?)

N/A

5. Does the agreement or policy contain a statement concerning whistleblower rights?

☐ Yes    ☐ No



## COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   **Improper Accessing of Medical Records**

   Coerce Political Activity

   Other

Attachments

Consent

Certification

### Improper Accessing of Medical Records

An agency official is prohibited from accessing the medical records of another employee or applicant for employment as a part of, or otherwise in furtherance of, the commission of a prohibited personnel practice. 5 U.S.C. § 2302(b)(14).

Please briefly answer the following questions about your claim.

1. Who accessed your medical records?

N/A

2. When were they accessed?

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   **Improper Accessing of Medical Records**

   Coerce Political Activity

   Other

Attachments

Consent

Certification

3. Please provide any additional details you may have to describe how your records were accessed.

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

**Improper Accessing of Medical Records**

Coerce Political Activity

Other

Attachments

Consent

Certification

4.  What reason did the agency give to explain why they accessed your medical records?  Why do you think they did so?

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
| --- | --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

**Improper Accessing of Medical Records**

Coerce Political Activity

Other

Attachments

Consent

Certification

5. What action, if any, did the agency take based on information learned from your medical records?

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

**Improper Accessing of Medical Records**

Coerce Political Activity

Other

Attachments

Consent

Certification

6.  Do you think that agency officials improperly accessed your medical records in connection with one of the other PPPs listed on this form?  If so, please describe.

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

**Your Complaint**

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   **Coerce Political Activity**

   Other

Attachments

Consent

Certification

### Coerce Political Activity

     An agency official is prohibited from coercing a person to engage in political activity, and from taking action against a person for refusing to do so. This section prohibits the coercion of a person's political activity, including providing any political contribution or service. 5 U.S.C. § 2302(b)(3).

     Please briefly answer the following questions about your claim of coerced political activity.

1. Describe the political activity or service you were coerced into undertaking.

N/A



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   **Coerce Political Activity**

   Other

Attachments

Consent

2. How did an agency official attempt to coerce political activity?

N/A

3. When did the coercion occur?

N/A

OMB No. 3255-0005
Expires 02/28/2026



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar |
| --- |

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

   Retaliation for Whistleblowing

   Retaliation for Protected Activity

   Obstruct Competition

   Give Unauthorized Preference

   Encourage Withdrawal from Competition

   Nepotism

   Improper Political Recommendation

   Violate Veterans' Preference

   Discrimination for Non-Job-Related Conduct

   Other Bases of Discrimination

   Improper Personnel Actions

   Non-Disclosure Agreement

   Improper Accessing of Medical Records

   **Coerce Political Activity**

   Other

Attachments

Consent

4. State the name, title and position in your chain of command of the agency official(s) involved in the coercion.

| First Name | Last Name | Title (*e.g.*, Deputy Director) | Chain of Command (*e.g.*, 1st level supervisor) |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |

5. Why did you feel coerced? (For example, what were the stated or implied adverse consequences for refusal to participate in the political activity or service?)

N/A

6. Have you also filed a Hatch Act complaint with OSC based on this incident?

☐ Yes ☐ No



**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

| Navigation Bar | |
|---|---|

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

Retaliation for Whistleblowing

Retaliation for Protected Activity

Obstruct Competition

Give Unauthorized Preference

Encourage Withdrawal from Competition

Nepotism

Improper Political Recommendation

Violate Veterans' Preference

Discrimination for Non-Job-Related Conduct

Other Bases of Discrimination

Improper Personnel Actions

Non-Disclosure Agreement

Improper Accessing of Medical Records

Coerce Political Activity

Other

**Attachments**

Consent

## Other

OSC also has jurisdiction over certain other activities prohibited by statute. If none of the categories of wrongdoing above apply to your circumstances, please tell us the basis of your complaint below. OSC will determine whether we have jurisdiction over your complaint. **You will have an opportunity to attach supporting documentation before you submit your form.**

## Attachments

☑ I would like to attach documents to my complaint.

OMB No. 3255-0005
Expires 02/28/2026

 **COMPLAINT OF PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

For instructions or questions, call the Case Review Division at (202) 804-7000.

---

**Navigation Bar**

**Prohibited Personnel Practices (PPP)**

About Filing a Complaint

Select your PPPs

Biographical Information

Your Complaint

  Retaliation for Whistleblowing

  Retaliation for Protected Activity

  Obstruct Competition

  Give Unauthorized Preference

  Encourage Withdrawal from Competition

  Nepotism

  Improper Political Recommendation

  Violate Veterans' Preference

  Discrimination for Non-Job-Related Conduct

  Other Bases of Discrimination

  Improper Personnel Actions

  Non-Disclosure Agreement

  Improper Accessing of Medical Records

  Coerce Political Activity

  Other

Attachments

**Consent**

---

## PART 5: CONSENT TO CERTAIN DISCLOSURES OF INFORMATION

*\* Denotes Required Fields*

OSC asks everyone who files a complaint alleging a possible prohibited personnel practice or other prohibited activity to select one of three Consent Statements shown below. Please: (a) select and check one of the Consent Statements below; and (b) keep a copy for your own records.

If you initially select a Consent Statement that restricts OSC's use of information, you may later select a less restrictive Consent Statement. If your selection of Consent Statement 2 or 3 prevents OSC from being able to conduct an investigation, an OSC representative will contact you, explain the circumstances, and provide you with an opportunity to select a less restrictive Consent Statement.

You should be aware that the Privacy Act and other applicable federal laws allow information in OSC case files to be used or disclosed for certain purposes, regardless of which Consent Statement you sign. Information about certain circumstances under which OSC can use or disclose information under the Privacy Act appears in the Form Submission part of this form.

***(Please check ONLY one)***

---

☑ *Consent Statement 1*

I consent to OSC's communication with the agency involved in my complaint. I agree to allow OSC to disclose my identity and information about my complaint if OSC decides that such disclosure is needed to investigate my complaint (for example, to request information from the agency, or seek a possible resolution).

---

☐ *Consent Statement 2*

I consent to OSC's communication with the agency involved in my complaint, but I *do not agree* to allow OSC to disclose my identity to that agency. I agree to allow OSC to disclose only information about my complaint, without disclosing my name or other identifying information, if OSC decides that such disclosure is needed to investigate my complaint (for example, to request information from the agency, or seek a possible resolution). I understand that in some circumstances, OSC could not maintain my anonymity while communicating with the agency involved about a specific personnel action. In such cases, I understand that my request for confidentiality may prevent OSC from taking further action on the complaint.

---

☐ *Consent Statement 3*

I do not consent to OSC's communication with the agency involved in my complaint. I understand that if OSC decides that it cannot investigate my complaint without communicating with that agency, my lack of consent will probably prevent OSC from taking further action on the complaint.

---



# U.S. Office of Special Counsel

| Navigation Bar | |
|---|---|
| Prohibited Personnel Practices (PPP) | |
| **Certification** | |

## CERTIFICATION

\* Denotes Required Fields

☑ I certify that all of the statements made in this complaint are true, complete, and correct to the best of my knowledge and belief. I understand that a false statement or concealment of a material fact is a criminal offense punishable by a fine, imprisonment, or both 18 U.S.C. § 1001

BURDEN: The burden for this collection of information (including the time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the form) is estimated to be an average of one hour to submit a disclosure of information alleging agency wrongdoing, one hour and fifteen minutes to submit a complaint alleging a prohibited personnel practice or other prohibited activity, or 30 minutes to submit a complaint alleging prohibited political activity. Please send any comments about this burden estimate, and suggestions for reducing the burden, to the U.S. Office of Special Counsel, General Counsel's Office, 1730 M Street, NW, Suite 218, Washington, DC 20036-4505.

OTHER INFORMATION: An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

> ***PLEASE KEEP A COPY OF YOUR COMPLAINT, ANY SUPPORTING DOCUMENTATION, AND ANY ADDITIONAL ALLEGATIONS THAT YOU SEND TO OSC NOW OR AT ANY TIME WHILE YOUR COMPLAINT IS PENDING.***
>
> *REPRODUCTION CHARGES UNDER THE FREEDOM OF INFORMATION ACT MAY APPLY TO ANY REQUEST YOU MAKE FOR COPIES OF MATERIALS THAT YOU PROVIDED TO OSC.*

Print and mail your complaint, please address it to:

U.S. Office of Special Counsel
1730 M Street, NW
Suite 218
Washington, DC  20036

# KATZ BANKS KUMIN

**ADDENDUM TO THE COMPLAINT OF PROHIBITED PERSONNEL PRACTICE
AND OTHER PROHIBITED ACTIVITY
BY THE DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBMITTED BY DR. JEANNE MARRAZZO**

## I.       FACTUAL BACKGROUND

Dr. Jeanne Marrazzo served as Director of the National Institute of Health's ("NIH") National Institute of Allergy and Infectious Diseases ("NIAID") from August 2023 until her involuntary removal on March 31, 2025. Dr. Marrazzo replaced Dr. Anthony Fauci, who had served as NIAID's Director for thirty-eight years, in that role. Her appointment was met with great acclaim by the scientific community.[1] NIH, part of the U.S. Department of Health and Human Services ("HHS"), is the primary agency of the United States federal government responsible for furthering medical research. It conducts and supports basic, clinical, and translational research into the causes, treatments, and cures for both common and rare diseases. NIH is comprised of 27 Institutes and Centers, each devoted to a unique biomedical discipline. NIAID is one such institute, and its mission is to conduct basic and applied research to better understand, treat, and prevent infectious, immunologic, and allergic diseases. As NIAID Director, Dr. Marrazzo oversaw an annual budget of $6.6 billion.

Dr. Marrazzo excelled as NIAID Director. However, following the inauguration of President Donald Trump and his appointment of Robert F. Kennedy Jr. as HHS Secretary, Dr. Marrazzo raised concerns to NIH leadership when HHS and NIH leadership pursued actions that not only directly undermined NIH's goal of furthering medical research, but also constituted a substantial and specific danger to public health and safety, and wasted funds by abandoning years-long research projects before they could implement their findings. She also objected to leadership's censorship of scientific research and their subordination of scientific integrity to unscientific and unsupported policy preferences. Specifically, Dr. Marrazzo objected to the Administration's hostility towards vaccines and its abrupt cancellation of grants and clinical trials for political reasons. In a blatant act of retaliation, on March 31, 2025, HHS removed Dr. Marrazzo from her position. HHS also removed other Institute and Center Directors who resisted the Trump Administration's efforts to prioritize politics over science. Dr. Marrazzo was placed on involuntary administrative leave, directed not to return to work, and told that she would be transferred to the Indian Health Service. Since that time, she has been given no work and remains in limbo.

Because there are reasonable grounds to believe that Dr. Marrazzo's administrative leave and reassignment constitutes a prohibited personnel practice, in violation of 5 U.S.C. § 1214, the Office of Special Counsel ("OSC") should request that HHS Secretary Kennedy stay this personnel action until OSC completes its investigation into Dr. Marrazzo's allegations. *See* 5

---

[1] *See* Jon Cohen, '*I'm never going to be Tony': Jeanne Marrazzo, Anthony Fauci's successor, vows a new direction at NIAID*, SCIENCE (Mar. 8, 2024), https://www.science.org/content/article/i-m-never-going-be-tony-jeanne-marrazzo-anthony-fauci-s-successor-vows-new-direction.

KATZ BANKS KUMIN

U.S.C. § 1214(b)(1)(A)(i); *Acting Special Counsel ex rel. Finkel v. Dep't of Labor*, 93 M.S.P.R. 409, 412 (2003) (hearing OSC's request for stay with MSPB upon the expiration of informal stay agreed upon by OSC and federal agency).  Securing a stay of Dr. Marrazzo's administrative leave will ensure that during the pendency of the OSC investigation, she will be able to continue to lead NIAID as it does its critically important work of furthering research into prevent infectious, immunologic, and allergic diseases.

## A. Background and Hiring

Dr. Marrazzo was preeminently qualified for her position as NIAID Director.  She holds a bachelor's degree in biology from Harvard University and an M.D. from Thomas Jefferson University.  She completed a residency in internal medicine at Yale-New Haven Hospital before pursuing a Master of Public Health in Epidemiology from the University of Washington.  Her research has been continually funded by NIH grants since 1997, including research into the human microbiome, specifically as it relates to female reproductive tract infections and hormonal contraception; HIV prevention through biomedical interventions such as preexposure prophylaxis ("PrEP") and microbicides; the pathogenesis and management of bacterial vaginosis; and sexually transmitted diseases ("STD"), including in people with HIV.  She is internationally recognized for her research and education efforts in the field of HIV and other sexually transmitted infections, infections caused by anaerobic bacteria, women's health, and COVID.  She has published over 200 articles, reports, and editorials and dozens of book chapters.  She has led multiple international clinical trials and translational research and has taught courses in medicine, infectious diseases, and global health at the University of Washington and University of Alabama at Birmingham.  Immediately prior to her role as NIAID Director, she was a professor of medicine and the director of the Division of Infectious Diseases at the University of Alabama Heersink School of Medicine at Birmingham, as well as the Executive Vice Chair of the Department of Medicine there.

Dr. Marrazzo has served as President of the American STD Association, President of the International Society for STD Research, President of the Anaerobe Society of the Americas, and President of the International Society for STD Research Foundation.  Her professional memberships include serving as Chair of the American Board of Internal Medicine ("ABIM") Council, Chair of the ABIM Infectious Disease Examination Board, and Chair of the ABIM Infectious Disease Subspecialty Board.  Dr. Marrazzo has also chaired both the American Board of Internal Medicine ("ABIM") Council and the ABIM Infectious Disease Specialty Board.  Dr. Marrazzo's numerous honors and awards include receiving both an Achievement Award and a Distinguished Career Award from the American STD Association and a Proclamation of Service to the City of Birmingham, AL.  Dr. Marrazzo was elected to membership in the National Academy of Medicine in 2024 and is a Fellow of the American College of Physicians and of the Infectious Diseases Society of America, as well as a member of the American Clinical & Climatological Association.  She is board certified in infectious disease.

# KATZ BANKS KUMIN

Dr. Marrazzo was appointed NIAID Director after a rigorous and competitive hiring process.  In addition to establishing her qualifications through a detailed application and letter in January 2023, she was extensively interviewed in March and April 2023 about her research, background, vision for NIAID, and views about the future of the field.  She sat for panel interviews with half a dozen NIH Institute and Center Directors, non-government research scientists, and community health leaders.  She was also interviewed by several scientists from within NIH, including NIH's Acting Director Dr. Lawrence Tabak.  In early June 2023, Dr. Tabak told Dr. Marrazzo that she would likely receive an offer after meeting with then-HHS Secretary Xavier Becerra.  Dr. Marrazzo traveled to Washington, D.C. to meet Secretary Becerra later that month, and soon after, Secretary Becerra offered her the position, contingent upon her successful completion of a background and security check.  She was vetted by the FBI and approved for the top security clearance.  She then began her work as NIAID Director on September 24, 2024, reporting to Acting NIH Director Dr. Tabak.

Dr. Marrazzo relinquished several alternative prestigious offers to take this federal position, including an appointment as Vice President of the Infectious Disease Society of America, which would have come with an ascension to President in 2026.  However, she chose the NIAID position over this offer because she believed in NIH's mission of furthering important medical research to enhance health, lengthen life, and reduce illness and disability.  Dr. Marrazzo excelled as NIAID Director.  She worked with external and internal stakeholders to craft a new NIAID strategic plan, reconstituted the Office of the Director after the previous Director retired, and oversaw and furthered valuable research to save lives.  In recognition of her outstanding performance, she received the highest possible performance ratings for her outstanding work.  *See* 2024 J. Marrazzo SES Performance Management System, Executive Performance Plan, attached hereto as Exhibit 1.

## B.  The Trump Administration's New Priorities

On January 22, 2025, the Trump administration appointed Dr. Memoli to serve as the Acting NIH Director, pending the Senate's confirmation of President Trump's nominee for NIH Director, Dr. Jay Bhattacharya.  This was a significant promotion for Dr. Memoli, who previously served as an intramural researcher in NIAID managing only a small subsection of a lab.  Dr. Memoli had no relevant substantive leadership or administrative experience.  Typically, NIH's Principal Deputy Director is appointed to serve as the Acting Director during an administrative transition.  Dr. Tabak, who was appointed NIH Principal Deputy Director in 2010, served as the Acting NIH Director through several presidential transitions, including from December 2021 to November 2023 while awaiting the confirmation of incoming NIH Director Dr. Monica Bertagnolli.  In a deviation from this standard protocol, Dr. Tabak was excluded from key meetings and was forced to resign on February 12, 2025, ending his decades-long tenure at NIH.[2]  Dr. Tabak had served as the acting director of the NIH during the COVID-19

---

[2] Alexander Tin, *Top-ranking NIH official forced to retire under Trump administration*, CBS NEWS (Feb. 12, 2025), https://www.cbsnews.com/news/nih-official-dr-lawrence-tabak-forced-to-retire-trump-administration/.

# KATZ BANKS KUMIN

pandemic and as the agency's top ethics official.  Dr. Marrazzo and her colleagues were shocked by the summary dismissal of this non-political and well-respected leader, and equally shocked by Dr. Memoli's promotion, which bypassed several tiers in the NIH reporting structure.  While it was not immediately clear who made the decision to promote Dr. Memoli, the media reported that the Trump Administration specifically chose him for the interim role.[3]  His selection was not surprising because of the highly public political positions Dr. Memoli has taken criticizing the vaccination of healthy people during the COVID pandemic, seeking a religious exemption to NIH's requirement that its employees receive the COVID vaccine, and speaking to the *Wall Street Journal* about his opposition to vaccines.[4]  He also articulated his opposition to the term "DEI" and related activities prioritized by many organizations, including the previous Administration.  While Dr. Memoli's position on the COVID vaccine represented a minority view within the scientific community, it aligned with the political, non-scientific opinions of then-incoming HHS Secretary Kennedy and other Trump Administration officials.[5]

On or around January 28, 2025, Dr. Marrazzo had a routine introductory meeting with Dr. Memoli.  This was Dr. Marrazzo's first time meeting Dr. Memoli, and Dr. Marrazzo came prepared to discuss NIAID's new strategic plan.  It was her intention to form a strong partnership with Dr. Memoli and to offer support on behalf of NIAID for his new role.  This was not to be. Dr. Memoli arrived ten minutes late to their meeting and made it apparent that he was not interested in Dr. Marrazzo's vision for NIAID.  Going into the meeting, Dr. Marrazzo was cautiously optimistic that because Dr. Memoli was an influenza researcher and came from NIAID, he would recognize that she had a different view of the work that the Institute did, as outlined in the new strategic plan, which emphasized the interaction between the human immune system and pathogens studied.  Dr. Marrazzo attempted to discuss her plans for reviewing the intramural program, which she felt could benefit from external review, but Dr. Memoli did not signal interest in this or anything else she raised.  Notably, he did not suggest any follow-up, did not ask her about specifics of or plans to roll out the strategic plan, and perfunctorily ended the meeting.

---

[3] Jocelyn Kaiser, *In further signs of NIH turmoil, top official suddenly retires,* SCIENCE (Feb. 12, 2025), https://www.science.org/content/article/top-nih-official-suddenly-steps-down; Eric Boodman & Anil Oza, *Veteran researcher who was critical of U.S. response to Covid named acting NIH head*, STAT (Jan. 24, 2025), https://www.statnews.com/2025/01/24/trump-nih-acting-director-matthew-memoli-infectious-disease-researcher-fauci-critic/.

[4] *See* Jenny Strasburg, *Vaccine-Mandate Debate Makes It to Federal Agency Where Fauci Works*, WALL ST. J. (Nov. 7, 2021), https://www.wsj.com/health/healthcare/vaccine-mandate-debate-makes-it-to-top-federal-research-agency-11636286400.

[5] Since assuming office, Secretary Kennedy has established a pattern of removing well-respected scientists from influential positions and replacing them with people who share his policy preferences. For example, in June 2025, Secretary Kennedy fired all 17 members of the Advisory Committee on Immunization Practices, the influential committee that recommends which vaccines Americans should get, and named eight new members, at least half of whom have expressed skepticism about vaccines. *See* Helen Branswell et. al*, Health secretary RFK Jr. abruptly fires CDC vaccine advisory panel*, STAT (Jun. 9, 2025), https://www.statnews.com/2025/06/09/rfk-jr-fires-every-member-of-cdc-vaccine-expert-panel-acip/.

KATZ BANKS KUMIN

The NIH Director led a meeting of Institute and Center Directors ("ICD") and senior NIH leaders every Thursday morning to discuss NIH priorities, important events such as White House meetings or congressional testimony, or to present on developing research.  During the ICD meeting on February 13, 2025, Dr. Memoli announced that NIH would be "doing things differently," as HHS's priorities were changing to reflect those of Secretary Kennedy and the Administration.  He also indicated that HHS leadership would take a close look at all "foreign aid" coming out of NIH.  He emphasized that the Institutes should prioritize ensuring that their work aligned with President Trump's executive orders on diversity, equity, and inclusion.  Remarking on a court's recent temporary injunction of some key parts of the President's executive actions related to diversity and gender, Dr. Memoli stated that judges were "hampering us."  He made it clear that implementing President Trump's executive actions was more important than ensuring scientific integrity in NIH's research, more important than foreign grants, and ultimately more important than the research which had been at the heart of NIH's mission.  In fact, during this meeting, Dr. Memoli did not mention public health, patient safety, or furthering scientific research a single time.  These omissions were of great concern to Dr. Marrazzo.

On or around February 15, 2025, Dr. Marrazzo met with James McElroy, who had recently been named Deputy Chief of Staff at NIH, reporting directly to Dr. Memoli.  Dr. Marrazzo learned that he had scheduled "meet and greets" with all of the other Institute Directors as well, presumably to introduce himself, meet them, and learn about their work.  Dr. Marrazzo's meeting with Mr. McElroy lasted around 20 minutes, and Mr. McElroy spent nearly the whole meeting asking Dr. Marrazzo extremely basic questions about NIAID.  Dr. Marrazzo was shocked by his lack of relevant knowledge.  Typically, Deputy Chief of Staff roles are filled by career officials with a background in the relevant subject area, but Mr. McElroy knew nothing about NIH or NIAID.  In fact, he knew nothing about clinical trials or NIH's procedures to reinforce and ensure scientific integrity, including peer review and careful assessment and vetting of grants to investigative teams outside the U.S.  Indeed, Mr. McElroy had no government experience and no science background.  His work experience consisted entirely of around eight years in the finance and technology sectors, and the publication of a smattering of articles in a conservative magazine, often about partisan politics and Leftist "wokeness."  Mr. McElroy openly stated that he took the job with NIH because he loved President Trump and sought to advance the goals of his Administration.  While it was never made clear to Dr. Marrazzo who hired Mr. McElroy and placed him in this role, it was clear that Mr. McElroy was to serve as a liaison between NIH and the Trump Administration.

Mr. McElroy made several comments about NIH and NIAID during their meeting on February 15, 2025, that deeply concerned Dr. Marrazzo.  For example, Mr. McElroy asked Dr. Marrazzo how NIAID was going to be "different" in the future given the "unethical research" it had conducted in the past.  While Mr. McElroy did not clarify exactly which research he viewed as "unethical," Dr. Marrazzo understood the reference to mirror partisan talking points critical of the work of former NIAID Director Dr. Anthony Fauci.  Dr. Marrazzo responded that NIAID of course does not do unethical research.  She described at a high level the safeguards that NIAID

has in place to maintain the highest standards of integrity in all its work, but Mr. McElroy did not appear interested in learning about these processes.  Additionally, Mr. McElroy pressed Dr. Marrazzo about why NIAID does research at international sites, suggesting that NIAID supports research abroad because regulations are "looser" and researchers can do "whatever they want." This belief was misguided and baseless.

Dr. Marrazzo was offended by the suggestion that NIAID routinely cut corners or tried to evade rigorous oversight.  She told Mr. McElroy that this was absolutely not true.  She explained to Mr. McElroy that in her experience as a Principal Investigator overseeing clinical trials on HIV prevention in South Africa, the regulatory oversight was in all cases as stringent as the oversight in the United States.  She explained that NIH has collaborated with scientists in South Africa for years and built strong, trusted relationships.  She also explained that clinics in South African developed an enviable model of community engagement, which was crucial because the success of clinical trials often depended on the strong engagement of community partners. Lastly, she explained to Mr. McElroy that research needed to be conducted where the diseases are.  For example, scientists cannot study malaria in the United States because the incidence of malaria in the United States is simply not high enough for this to be efficient.  Mr. McElroy asked Dr. Marrazzo how she could trust researchers abroad.  Dr. Marrazzo responded that the NIH had developed relationships with trusted scientists over years of working together.  He seemed skeptical of her explanations, and it became clear to her that even though he had no rational basis for concluding otherwise, he would not modify his beliefs in the face of the information she provided to him.  Dr. Marrazzo told Mr. McElroy that she would be willing to talk to anyone on the Hill or in the White House who had questions about NIAID's work—an offer he clearly had no interest in accepting.  Mr. McElroy concluded the meeting by telling Dr. Marrazzo that she "must know" that "NIAID would be treated differently than all the other Institutes" given its role in the pandemic.  Dr. Marrazzo left the meeting feeling that there was a target on her back and on NIAID because of NAID's mission to develop medical countermeasures for emerging infectious diseases, with the COVID pandemic serving as the prototypical example.  Dr. Marrazzo was determined to continue her advocacy for NIAID's important work, and to push back against the Administration's actions to undermine scientific research that was foundational to NIAID's mission.

### C.  Dr. Marrazzo's objections to actions undermining scientific integrity

During the ICD meeting on February 20, 2025, Dr. Marrazzo gave a presentation about the recent outbreak of avian influenza (H5N1).  One of the slides pointed out that by that date, 68 pediatric deaths had been attributed to influenza in the U.S.  This was a remarkably high fatality rate, particularly that early in the season.[6]  In response, Dr. Memoli stated that while a vaccine was "fine," the number one way to prevent bad outcomes in a respiratory outbreak is to have a

---

[6] The American Hospital Association has since confirmed a total of 266 pediatric influenza deaths during the 2024-25 flu season, which make it the deadliest non-pandemic flu season on record. *See Pediatric flu deaths reach 266 for 2024-2025 season,* AM. HOSP. ASS'N (July 28, 2025), https://www.aha.org/news/headline/2025-07-28-pediatric-flu-deaths-reach-266-2024-2025-season.

healthy population.  In advancing this view, Dr. Memoli was simply echoing one of Secretary Kennedy's favorite talking points: that HHS should focus on chronic disease over infectious diseases.  Dr. Kathleen Neuzil, then-Director of the Fogarty International Center, interjected to say that while she agrees that decreasing the prevalence of chronic diseases is important, vaccines are also necessary for disease control because not everyone with a serious viral infection has a chronic disease.  She pointed out that a significant proportion of children in the mortality estimate had healthy immune systems but were unvaccinated.  Dr. Memoli appeared annoyed by Dr. Neuzil's remarks and did not respond.

On February 24, 2025, Dr. Marrazzo attended a meeting to brief the White House Office of Pandemic Preparedness and Response ("OPPR") on NIAID's role in biopreparedness and biosecurity.  Present at the meeting were OPPR Director Gerald Parker, Dr. Memoli, John Burklow, James McIlroy, Gerald Parker, Rachel Idowe, Dr. Marrazzo, Clifford Lane, and others.  Dr. Marrazzo gave a presentation about pandemic preparedness-related activities at NIAID, and included slides from Dr. Neuzil about pandemic preparedness-related activities at Fogarty.  Near the end of the meeting, Dr. Memoli reiterated the Administration's position that vaccines are unnecessary if populations are healthy.  Again, Dr. Neuzil interjected.  She stated that the country was on a trajectory to have the highest number of pediatric deaths from influenza in a single year, and that more than half of the children affected were previously healthy.  She focused her comments on pediatric deaths because deaths from influenza in children are reportable, while such deaths from adults are not.  Therefore, individual clinical information is available for children who die from influenza but not for adults who die from influenza.  Nonetheless, the available data highlighted the rise in fatalities among unvaccinated individuals.  Dr. Neuzil stated that treatment of chronic diseases is important, but prevention of infectious disease is also crucial. She emphasized that any credible disease prevention effort will include vaccines.  Once again, Dr. Memoli demonstrated his frustration and anger with Dr. Neuzil.  Indeed, this scene was a near-verbatim reenactment of Dr. Memoli and Dr. Neuzil's exchange during the ICD meeting four days previously.  Dr. Marrazzo emphasized her support for Dr. Neuzil's position and stated that what Dr. Neuzil said about vaccines affecting healthy children, and the importance of vaccines, was accurate.  Dr. Memoli refused to make eye contact with either Drs. Marrazzo or Neuzil and dismissed their contributions.  He repeated that there is nothing more important than making sure children are healthy to begin with and made clear that NIH should not focus on vaccines.

During the ICD meeting on March 13, 2025, Dr. Memoli announced that the White House had directed NIH to suspend funding for some clinical trials.  He explained that NIH would cut funding for some clinical trials within the United States—including funding to Columbia University, which the White House was targeting because of concerns about Antisemitism, and also clinical trials abroad due to concerns related to oversight of awards to "foreign" partners, because of concerns raised in the Executive Order about South Africa.  Dr. Marrazzo responded by expressing strong concerns that the cessation of clinical trials would endanger participant safety because clinical trials provided necessary medical interventions to their participants.  As an example, she brought up a Columbia study of immunocompromised children who received treatment through an NIAID-funded study situated in the NIAID Division

KATZ BANKS KUMIN

of Allergy, Infectious Diseases, and Transplantation.  She explained that cutting funds to Columbia would mean that these children would not have access to the medical care they needed.  She further explained that the abrupt end of clinical trial would breach ethical standards that are at the heart of the relationship between researchers and trial participants.  At the beginning of a clinical trial, participants sign a consent form defining and outlining the terms of the engagement, and these forms obligate the researcher to provide what is outlined in the consent form.  Thus, if a patient in need of medical care agrees to participate in a clinical study through which they receive regular doses of a drug for six months, that patient consents to receiving that drug for six months, and the researcher agrees to provide it for six months.  The researcher would violate medical ethics if she ended the program before the six months has ended.  Moreover, a vulnerable patient could be left without the medical interventions they rely on, with little or no warning.  Dr. Marrazzo also raised concerns about the lasting damage to NIH's ability to recruit clinical trial participants in the future.  She noted that NIH and NIAID have spent decades building trust with community partners, and the breach of trust that would occur as a result of the cessation of an ongoing clinical trial would damage NIH's ability to recruit participants in the future.  Lastly, clinical trials routinely collect human specimens to test participants' responses to an intervention.  Dr. Marrazzo expressed concern that the cessation of clinical trials could mean that already-collected human samples would not be tested or appropriately stored or used and therefore could go to waste, even though so much effort was expended to collect them.  Dr. Memoli dismissed Dr. Marrazzo's concerns outright and said something along the lines of "don't worry, there will be orderly closeout of all clinical trials." This statement has proven untrue; clinical trials have been suspended without the usual process and without .[7]

Dr. Marrazzo attended the March 27, 2025 ICD meeting, which Dr. Memoli opened by expressing his happiness that Dr. Jay Bhattacharya had been confirmed as the new NIH Director earlier that week and would be sworn in later that day.  Later in the meeting, Acting Deputy Director for Extramural Research Jon Lorsch announced an overhaul of the process NIH uses to solicit and support vital scientific research.  A critical job of all NIH Institutes is to identify important research needs.  They identify these needs using their expertise in the field, through dialogue with external experts, and often by partnering with their advisory councils, which are crucial to inform members of the scientific community about the needs and desires of the populations most affected by the diseases under study.  Once receiving this information, NIH Institutes, independently or in conjunction with other Institutes, publish Notices of Funding Opportunities ("NOFOs") to notify those in the field about NIH's desire to fund specific research.  Research centers, universities, organizations, and principal investigators reply to the NOFO, and NIH thoroughly vets the replies to determine whether any meet their strict criteria and satisfy their needs.  If they do, NIH partners with them to fund the research.  NOFOs are the main tool that NIH uses to ensure the execution of vital research, and therefore, they further NIH's vital mission of advancing scientific research.

---

[7] *See, e.g., Stephanie Nolen, Promise of Victory Over H.I.V. Fades as U.S. Withdraws Support*, NY TIMES (Jun. 25, 2025), https://www.nytimes.com/2025/06/25/health/hiv-lenacapavir-vaccine-trump-cuts-africa.html.

KATZ BANKS KUMIN

During this meeting, Dr. Lorsch announced that NIH would begin to work on "repairing" its NOFOs to ensure their compliance with the new HHS priorities. Based on the context and the other recent activity within NIH, it was clear to Dr. Marrazzo that HHS priorities referred to alignment with President Trump's executive order about DEI initiatives; the Administration's desire to eliminate foreign research, which it continued to improperly label as "foreign aid," and; Secretary Kennedy's skepticism towards vaccines. Dr. Lorsch also announced that NIH would need to substantially reduce the number of NOFOs it put out, with the goal of cutting the number of NOFOs in half. Dr. Lorsch's announcement that NIH would subject the research it funded to political vetting would subordinate scientific integrity to politics, much to the detriment of scientific research and NIH's mission. Dr. Marrazzo was particularly offended that Mr. Lorsch described such political vetting as "repairing" the NOFOs, as if research informed purely by science and community needs, without political involvement, was broken or otherwise in need of "repair." Accordingly, she objected to his remarks.

Dr. Marrazzo asked Dr. Lorsch to clarify the Agency's position about NOFOs and asked what review criteria HHS would apply when reviewing them. Dr. Lorsch responded with the vague explanation that NOFOs would need to be consistent with the current changes in language and priorities that the Administration had already announced. He also indicated that the Administration could announce more changes in the future, in which case NOFOs would need to be consistent with those changes too. In other words, NIH would not be able to solicit vital research if it were inconsistent with any of President Trump's executive orders. Additionally, NIH would not be able to advance important vaccine research, as such research was deemed inconsistent with Secretary Kennedy's scientifically unsupported position that vaccines caused harm, including autism in children.

Dr. Marrazzo objected to Dr. Lorsch's remarks and asked who would have the authority to decide whether NOFOs sufficiently complied with HHS priorities. She was particularly concerned that this authority would be exercised solely by the Acting NIH Director, whose content expertise was limited to his research on influenza. Further, he had no awareness of current developments in the field and therefore could not intelligibly determine which NOFOs should be prioritized or why they were important. No single person would be sufficiently qualified to make these decisions by themselves. Indeed, the decision to issue a NOFO is traditionally made by teams of experts, informed by external councils of both scientific and community-based experts. To concentrate such power with the NIH Director would effectively turn the expert-driven process into a purely political process, cementing the prioritization of political policy over scientific integrity. Dr. Marrazzo believed that such a shift would not serve the mission of science and would undermine NIH's mission. Accordingly, she continued to press her concerns.

Dr. Marrazzo asked Dr. Lorsch what considerations would be applied to ensure that important scientific research continued. She noted that NOFOs were often used to build on recent developments in a field and to ensure that the substantial resources that NIH invested to build scientific knowledge and develop new medical interventions were seen through to the stage where they could have a positive impact and be implemented. Especially in light of Dr. Lorsch's

# KATZ BANKS KUMIN

announcement that NIH sought to reduce the NOFOs by half, Dr. Marrazzo raised concerns about how NIH could reduce this number while still getting the return on its investments and still carrying out NIH's mission. She pointedly asked, if NOFOs were to be cut so dramatically, and some important research was to be cut, how it would be determined which important research areas needed to be sacrificed. Dr. Marrazzo also asked whether NIH would give appropriate consideration to the need to keep important science going (especially in urgent public health needs) when considering the NOFOs being cut. She emphasized the importance of content expertise and the expertise of the teams of people that draft and review every proposal. She stated that no one is better positioned to determine research needs and direct research funds than the Institute Directors, advised by their internal staff (program officers in particular, who generally have extensive experience with the funding history in a given area and also closely follow all developments in their fields) and external advisory boards. Dr. Marrazzo noted that she was concerned that taking this decision-making authority out of the hands of experts would turn the decisions about cutting NOFOs into an arbitrary process, or one directed by other, non-scientific priorities. Her remarks were not well-received and led to tense exchanges.

Dr. Memoli stated something about how "we're going to need to be more specific," presumably about how to ensure that continuing research reflects HHS priorities. Dr. Lorsch stated that the NIH itself should not determine research priorities anyway (for example, by issuing NOFOs), and that researchers in the field should set their own priorities. This was concerning, because the NOFOs issued by NIAID typically derive from a careful process whereby NIAID leaders and staff engage in sustained interactions with scientific experts in the relevant fields and, in some cases, with members of the affected communities. Dr. Lorsch also stated that "community members should not be telling us what to do." This comment concerned Dr. Marrazzo because Dr. Lorsch seemed not to understand the robustness of these internal processes that NIAID used to define funding priorities and generate NOFOs that recognize and seek to advance the status of the science in a given field. NIAID, for example, had developed a model of community engagement that specifically solicited input from affected communities in meaningful dialogue with NIAID leadership as it set these priorities; NIAID's work with community leadership in the field of HIV/AIDS was seen as a role model for this process by many. Finally, ensuring continuity and implementation of important research was central to NIH's mission. This conversation took place toward the end of the ICD meeting, and ultimately, Dr. Lorsch seemed eager to end the conversation and adjourn the meeting. Dr. Marrazzo's concerns were never satisfactorily addressed.

10

KATZ BANKS KUMIN

### D. Dr. Marrazzo's Removal

Four days later, HHS removed Dr. Marrazzo from her position as NIAID Director.  At nearly 10:00 p.m. on March 31, 2025, Dr. Marrazzo received an email from HHS Human Resources Officer Thomas Nagy, stating that HHS had reassigned her to the Indian Health Service.  It asked her to respond to the email within two days communicating her reassignment preferences among the following locations: Alaska, Albuquerque, Bemidji, Billings, Great Plains, Navajo, and Oklahoma.  The email further informed her that HHS had placed her on administrative leave, to begin the following day, and she should not show up to work the following day.  Dr. Marrazzo was given no warning, no prior opportunity to inform her staff in person, no opportunity to clear out her office, and no opportunity to wind up projects or prepare transition memoranda.  Dr. Marrazzo promptly responded to Mr. Nagy saying that she was interested in learning more about the Indian Health Service opportunities.  Since that time, and despite her efforts to receive information about her reassignment, HHS's only subsequent contact occurred on May 21, 2025, when HHS Human Resources asked Dr. Marrazzo for her accurate and updated resume, which she sent.  This is the last correspondence she received from HHS.

Since April 1, 2025, Dr. Marrazzo has been left with no duties or responsibilities, and her requests for information about her reassignment have been ignored.  Since early May, HHS has denied Dr. Marrazzo access to her NIH email and all relevant government employment websites that required specific NIH VPN log-in.

### I.    LEGAL ANALYSIS

The Whistleblower Protection Act ("WPA") protects federal employees who disclose evidence of illegal or improper government activities.  Under the WPA, agencies may not take a "personnel action" against an employee for disclosing information that the employee "reasonably believes" evidences a violation of any law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; a substantial and specific danger to public health or safety, or; censorship related to scientific research or the integrity of the scientific process if the censorship will cause one of the aforementioned categories of wrongdoing.  5 U.S.C. § 1213(a)(1); 5 CFR § 1800.3(a).  Dr. Marrazzo will be able to establish a violation of the WPA because: 1) she made a protected disclosure; 2) HHS took an adverse action against her; and 3) her disclosure was a contributing factor in the agency's decision to take an adverse action against her.  *See Kuriakose v. Dep't of Veterans Affs.*, 800 F. App'x 889, 894 (Fed. Cir. 2020) (outlining elements of WPA claim).

### A. Dr. Marrazzo made protected disclosures under the WPA.

In the months preceding her involuntary removal from her position, placement on administrative leave, and proposed reassignment, Dr. Marrazzo made numerous protected disclosures that she reasonably believed evidenced a substantial specific danger to public health or safety, gross mismanagement, gross waste of funds, and scientific censorship.  Whether an employee has a reasonable belief that the disclosures revealed misbehavior described by section

11

2302(b)(8) "turns on the facts of the particular case." *Herman v. Dep't of Justice*, 193 F.3d 1375, 1382 (Fed. Cir. 1999). Dr. Marrazzo need not prove that the actions she opposed actually constituted a substantial and specific danger to public health or safety, gross mismanagement, gross waste of funds, or scientific censorship; rather, she must establish that "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [would] reasonably conclude that the government's action so qualify." *Kahn v. Dep't of Just.*, 618 F.3d 1306, 1312–13 (Fed. Cir. 2010) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). Dr. Marrazzo made numerous protected disclosures between January 2025 and her involuntary removal on March 31, 2025.

i.    The Administration's policy opposing foreign research

Dr. Marrazzo engaged in protected activity on February 15, 2025, when she objected to the Trump Administration's intention to cut funding for foreign research. Dr. Marrazzo explained to Mr. McElroy that foreign research was vital to NIAID's mission of advancing scientific knowledge because research is best conducted where the disease being studied is most prevalent. She reasonably believed that cutting grant funds for foreign research "was likely to have a substantial detrimental impact on [NIAID's] ability to complete its mission," such that such actions constituted gross mismanagement. *See Hessami v. Merit Sys. Prot. Bd*., 979 F.3d 1362, 1370 (Fed. Cir. 2020) (concluding disclosure that VA physician was prescribing more expensive drugs to patients and for substantially longer than necessary or recommended, constituted disclosures of gross mismanagement because the higher costs were "likely to have a substantial detrimental impact" on the VA Center's mission of providing healthcare).

ii.    The Administration's abrupt cessation of clinical trials

Dr. Marrazzo made protected disclosures under the WPA during the March 13, 2025, ICD meeting when she objected to the Trump Administration's abrupt cessation of vital clinical trials. When Dr. Memoli announced that the White House had directed NIH to cut off funding for clinical trials, Dr. Marrazzo forcefully voiced her concerns. First, she raised concerns that abruptly discontinuing clinical trials would endanger the patients who received necessary medical interventions through those trials. She brought up a specific example of a study of immunocompromised children at Columbia University and stated that the Administration's plan to end that study would leave these children without the medical care on which they had come to rely. Dr. Marrazzo reasonably believed that plans to cut off funding for clinical trial such as this would constitute a "substantial and specific" to public health and safety because abruptly withholding medical care on which patients have come to rely would lead to imminent patient harm. *See Chambers v. Dep't of Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010) (explaining that a whistleblower who identifies (1) a likelihood of harm resulting from the danger; (2) that is imminent; and (3) and would lead to severe consequences makes a protected disclosure of a substantial and specific danger to public health and safety under the WPA). Dr. Marrazzo further pointed out that the cessation of clinical trials lacked any clinical justification, and she therefore reasonably believed that deviating from clinical care standards "without clinical justification for doing so" created "a substantial and significant danger to public health."

*Hessami*, 979 F.3d at 1370 (finding that employee who reported variations in medical treatment without clinical justification made protected disclosure under the WPA).

Dr. Marrazzo additionally engaged in protected activity when she raised concerns that terminating clinical trials would waste funds and undermine NIH and NIAID's mission. She explained during the ICD meeting that many of the clinical trials that the Administration sought to end were very close to making important conclusions following years of research. NIH and NIAID had previously invested resources researching important public health needs, developing interventions, and then dispersing such interventions to patient populations. In some cases, clinical trials had even collected human specimens in order to be able to evaluate the effectiveness of the intervention. Abruptly cutting off funds could mean that already-collected human specimens could go untested. In other words, NIH and NIAID could have supported research for decades, and the Administration wanted to take action that prevented NIH and NIAID from learning the conclusions of this research. Two specific examples are research into the prevention and management of HIV and tuberculosis ("TB"). Numerous scientific publications in the last two years have shown that efforts to develop an HIV vaccine are finally yielding results that could pay off for HIV prevention in the immediate future. However, on March 25, 2025, HHS terminated funding for the Adolescent Medicine Trials Network for HIV Interventions after nearly 25 years. Stopping this work would risk the loss of billions of dollars that have been invested in this critical goal. Similarly, for the first time, there is a promise of effective TB vaccines, with one candidate currently under study in a large international trial. NIAID invested in several key consortia and efforts to accelerate this progress. However, HHS has recently cut funding for one such program, the IMPAc-TB program to study protective immune mechanisms, by one third. Other examples include the cessation of funding for the NIAID-supported Centers for Research in Emerging Infectious Diseases, which has accrued valuable information on challenging diseases like dengue, malaria, Chikungunya virus, and tickborne diseases. Together, the cessation of funding for these promising research programs wastes billions of dollars and valuable research time, and harms public health by preventing the development of these potentially life-saving interventions.

Dr. Marrazzo reasonably believed that such actions would constitute a gross waste of funds because NIH would be effectively throwing away significant time and money in exchange for saving comparatively modest expenditures. *See Van Ee v. E.P.A.*, 64 M.S.P.R. 693, 698 (1994) (defining "gross waste of funds" as "more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government"). Dr. Marrazzo also reasonably believed that terminating clinical trials would substantially hinder NIH and NIAID's ability to conduct important research to better understand, treat, and prevent infectious, immunologic, and allergic diseases, and therefore "was likely to have a substantial detrimental impact on [NIH's] ability to complete its mission." *See Hessami*, 979 F.3d at 1370 (concluding disclosure that VA physician was prescribing more expensive drugs to patients and for substantially longer than necessary or recommended, constituted disclosures of gross mismanagement because the higher costs were "likely to have a substantial detrimental impact" on the VA Center's mission of providing healthcare). Therefore, Dr. Marrazzo disclosed information that she reasonably believed evidenced gross mismanagement. *See id.*

13

iii.    The Administration's unscientific hostility towards vaccines

Dr. Marrazzo engaged in protected activity during the OPPR meeting on February 24, 2025 when she objected to the Administration's position that vaccines are not important for healthy children.  Dr. Memoli repeatedly pushed the Administration's new policy of declining to recommend vaccines for healthy children, and Dr. Marrazzo stated that, to the contrary, scientific research supports the idea that vaccinating healthy children is necessary to save lives.  She stated that Dr. Neuzil was correct that healthy, unvaccinated children have been dying from influenza in record numbers, and that scientific evidence supported the conclusion that vaccinating healthy children saves lives.  She thus engaged in protected activity by identifying specific evidence "either of actual past harm or of detailed circumstances giving rise to a likelihood of impending harm."  *Chambers*, 602 F.3d at 1376 (finding that Park Police Chief's disclosure about increased traffic accidents from too few patrolling officers evidenced substantial and specific danger to public health or safety so as to be protected under the WPA).

Importantly, Dr. Marrazzo's disclosures about the necessity of vaccines do not lose their protected status because they implicate "heavily debated" questions of policy.  *Hessami*, 979 F.3d at 1370.  "Congress made clear that policy decisions and disclosable misconduct under the WPA are not mutually exclusive."  *Id.* (citing S. Rep. No. 112–155, at 7–8 (2012), as reprinted in 2012 U.S.C.C.A.N. 589, 595–96).  That there is ongoing policy debate about the efficacy and necessity of vaccines "does not strip whistleblower protection from disclosures" that Dr. Marrazzo reasonably believed constituted a substantial and specific danger to public health and safety.  *Id.* at 1370.

iv.    The Administration's politicalization of scientific research

Dr. Marrazzo made protected disclosures again during the March 27, 2025, ICD meeting in response to Dr. Lorsch's announcement that NIH would cut its funding opportunities in half and vet them to ensure compliance with the Trump Administration's DEI initiatives and policy preference to discontinue support of overseas medical research.

Dr. Marrazzo raised concerns about who would have the authority to decide whether NIH's funding opportunities sufficiently complied with the Administration's political priorities, making clear that she objected to political actors within the Administration subordinating scientific integrity to further their political preferences.  Therefore, she reasonably believed that this political vetting constituted "censorship related to scientific research or the integrity of the scientific process."  5 CFR § 1800.3(a).  Further, she raised concerns that such censorship would undermine NIH and NIAID's mission to further medical research and therefore disclosed a reasonable belief that NIH's actions constituted gross mismanagement.  *See Hessami*, 979 F.3d at 1370 (defining gross mismanagement to include agency action "likely to have a substantial detrimental impact on [agency's] ability to complete its mission").  Dr. Marrazzo also questioned how, in light of such political censorship, NIH could ensure that the substantial resources it had already invested to build scientific knowledge would be continued through the stage where NIH could reap the rewards of its investment.  Absent such assurance, Dr. Marrazzo reasonably believed that ending research projects right before they were about to provide valuable

contributions to the medical field constituted a gross waste of those already-invested resources. *See Van Ee*, 64 M.S.P.R. at 698.

**B. Dr. Marrazzo's protected disclosures contributed to the adverse personnel actions HHS took against her.**

As an initial matter, HHS's removing Dr. Marrazzo from her position and placing her on administrative leave, as well as the agency's stated intention to reassign her to the IHS, constitute adverse personnel actions within the meaning of the WPA. Personnel actions under the WPA include a "transfer," "reassignment," and "any significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A). The definition of personnel action "must be interpreted broadly." *Singleton v. Ohio Nat. Guard,* 77 M.S.P.R. 583, 587 (1998). When HHS removed Dr. Marrazzo from her position as NIAID Director and stated that it would reassign her to the IHS, it engaged in a prohibited personnel practice. *See Onasch v. Dep't of Transp.*, No, 1994 WL 283861 (M.S.P.B. June 17, 1994) (reassignment, combined with loss of responsibility and the significant reduction in the number of persons supervised, is a prohibited personnel action under WPA); *Johns v. Dep't of Veterans Affairs*, No. CH-1221-98-0525-B-1, 2003 WL 22570157 (M.S.P.B. Aug. 14, 2003) (changes to whistleblower's duties and resources may constitute "significant change in duties, responsibilities, or working conditions").

Additionally, Dr. Marrazzo will be able to demonstrate that her protected disclosures contributed to these adverse actions. This "contributing factor" element can be established "through circumstantial evidence, such as evidence that (A) the official taking the personnel action knew of the disclosure ...; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure ... was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1); *see also Johnston v. Merit Sys. Prot. Bd.*, 518 F.3d 905, 912 (Fed. Cir. 2008) (" [A] whistleblower need only allege that the deciding official knew of the disclosure and that the adverse action was initiated within a reasonable time of that disclosure in order to make a prima facie case that the disclosure was a contributing factor in the adverse action.").

Under the "knowledge/timing test," Dr. Marrazzo can prove that her disclosure was a contributing factor in the personnel action through evidence that the official taking the personnel action knew of her whistleblowing disclosures and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *See Gonzalez v. Dep't of Transp.*, No. SF-0432-07-0397-I-2, 2008 WL 2573272 (M.S.P.B. June 30, 2008) (describing the "knowledge/timing test" as the "most common way of proving the contributing factor element" under the WPA) (citing 5 U.S.C. § 1221(e)(1)(A), (B)). Dr. Marrazzo can easily satisfy the knowledge component of the test because she made her protected disclosure directly to senior NIH leadership, including Dr. Memoli, Dr. Lorsch, and Mr. McElroy, the liaison between NIH and the White House. Even if these officials were not the lone decisionmakers, the WPA's causation standard is satisfied upon a showing that at least one of the officials behind the adverse action was aware of her protected activity. *See Cahill v. M.S.P.B.*, 821 F.3d 1370, 1376 (Fed. Cir. 2016).

Dr. Marrazzo can also easily satisfy the timing component of this causation test. The Merit Systems Protection Board has found that a period as long as 21 months between an employee's protected disclosure and adverse actions taken against her satisfy the timing element of the knowledge/timing test. *Redschlag v. Department of the Army*, 89 M.S.P.R. 589, ¶ 87 (2001) (appellant's disclosures were a contributing factor in her removal when they were made approximately 21 months and then slightly over a year before the agency removed her); *see also Jones v. Department of the Interior*, 74 M.S.P.R. 666, 676 (1997) (appellant's disclosures were a contributing factor in the lower rating the agency gave him in his performance evaluation, which occurred over a year after he made the disclosures). Here, Dr. Marrazzo began making protected disclosures in February, then was removed from her position in March. Indeed, she vigorously raised concerns about NIH's scientific censorship, gross mismanagement, and gross waste of funds during an ICD meeting just four days before HHS removed her from her position. The temporal proximity between her protected activity and the adverse action taken against her easily satisfies the timing element of the knowledge/timing test. *See Swanson v. General Services Administration*, 110 M.S.P.R. 278, ¶ 12 (2008) (finding interval of two to three months sufficiently close to satisfy the timing element of the knowledge/timing test). Therefore, Dr. Marrazzo can make a *prima facie* case of retaliation in violation of the WPA.

Additionally, NIH leadership's frequent displays of frustration towards Dr. Marrazzo in response to her protected disclosures are further evidence that her protected activity was a contributing factor to the adverse actions taken against her. *See Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1376 (Fed. Cir. 2012) (fact that whistleblower's disclosures "marked the beginning of his increasingly strained relationships" with agency officials is evidence of causation); *Kinan v. Dep't of Def.*, 87 M.S.P.R. 561, 569 (2001) (finding requisite causation where supervisor displayed frustration by employee's whistleblowing).

**C. HHS will not be able to demonstrate that it would have taken the same action absent Dr. Marrazzo's protected activity.**

Because Dr. Marrazzo can show that her protected disclosures were a contributing factor in the adverse personnel action taken against here, the burden shifts to HHS to establish, "by clear and convincing evidence, that it would have taken adverse personnel actions against [her] even absent any protected disclosures." *Johnston*, 518 F.3d at 911. To determine whether the agency has met its burden, the MSPB weighs three factors: (1) "the strength of the agency's evidence in support of its personnel action"; (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision"; and (3) "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Proving that an agency would have removed an employee regardless of her whistleblowing is a "high burden," and HHS will not be able to make this showing. *Whitmore*, 680 F.3d at 1372 (Fed. Cir. 2012).

First, the agency will not be able to offer any credible justification for reassigning Dr. Marrazzo to the IHS.  While it is true the IHS has a longstanding vacancy rate, those openings are largely for direct services positions such as physicians, nurses, and other care providers, not research scientists or administrators, and certainly not for senior administrators like Dr. Marrazzo.[8]  HHS's proffered justification for Dr. Marrazzo's removal is not credible because there are no positions within the IHS that are appropriate for someone with Dr. Marrazzo's skillset and experience.  *See Whitmore*, 680 F.3d at 1369 (explaining that "veracity and reliability" of agency's evidence alleged explanation of personnel action is relevant to assess independent causation).  To the contrary, Dr. Marrazzo skillset and experience made her uniquely qualified to serve as NIAID Director.  Evidence that Dr. Marrazzo excelled at the position from which she was removed, and that she received an "'outstanding' performance review," further undermines claims the government could make about any non-retaliatory explanation for her removal.  *Miller v. Dep't of Just.*, 842 F.3d 1252, 1260 (Fed. Cir. 2016) (concluding that government failed to establish it would have taken the adverse personnel action absent the employee's protected whistleblower disclosures).  Dr. Jeffery K. Taubenberger currently serves as the NIAID's Acting Director.  Notably, Dr. Taubenberger has not raised concerns about the Trump administration's politicalization of NIAID.  HHS will not be able to provide any nonretaliatory explanation for reassigning Dr. Marrazzo to the IHS.

Second, HHS had a strong motive to retaliate against Dr. Marrazzo.  She demanded explanations for HHS actions that censored scientific research, harmed public health, wasted NIH funds, and undermined NIH and NIAID's mission.  Administration officials repeatedly dismissed Dr. Marrazzo's concerns and declined to engage with her.  Removing Dr. Marrazzo from her position would therefore allow the agency to implement its political agenda with less opposition, and without having to explain its actions in response to thorough and evidence-based objections.  The agency thus had a strong retaliatory motive to remove her.  *See Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1366 (Fed. Cir. 2019) (agency had motive for retaliating against employee where it failed to address employee's repeated disclosures about agency's mismanagement).  The temporal proximity between Dr. Marrazzo's protected disclosures and her removal constitutes additional and independent evidence of retaliatory motive.  *See Aquino v. Dep't of Homeland Sec.*, 121 M.S.P.R. 35, 49 (2014) (temporal proximity of six days between employee's protected disclosure and personnel action "suggests a strong retaliatory motive").  Third, HHS will not be able to provide evidence that it took similar actions against employees who are not whistleblowers but who were otherwise similarly situated.

**D. The OSC should request that HHS reinstate Dr. Marrazzo and award appropriate damages.**

Because Dr. Marrazzo has experienced illegal retaliation in violation of the WPA, she is entitled to reinstatement, attorney's fees, any other reasonable and foreseeable consequential damages, and compensatory damages.  5 U.S.C.A. § 1214(g)(1), (2).  Because there are reasonable grounds to believe that a prohibited personnel practice occurred, the OSC should

---

[8] *See* Usha Lee McFarling, *Laid off HHS leaders offered transfers to remote Indian Health Service regions*, STAT (Apr. 1, 2025), https://www.statnews.com/2025/04/01/hhs-leaders-offered-transfers-to-indian-health-service/.

# KATZ BANKS KUMIN

request that HHS stay the personnel action and reinstate Dr. Marrazzo as NIAID Director.  *See* 5 U.S.C. § 1214(b)(1)(A)(i).  Such a stay would be appropriate because it "is designed to permit OSC to complete its investigation and may be granted on the basis of relatively little information."  *Special Counsel v. U.S. Fish & Wildlife Serv., Dep't of Interior*, 62 M.S.P.R. 388, 392 (1994).

EXHIBIT 1

**SES Performance Management System**
**Executive Performance Plan**



| Part 1. Consultation. *I have reviewed this plan and have been consulted on its development.* | |
|---|---|
| Executive's Name *(Last, First Middle)*:  MARRAZZO, JEANNE | Appraisal Pd. 10/1/2023 - 9/30/2024 |
| Executive's Signature:  Electronically signed by MARRAZZO, JEANNE | Date: 12/10/2023 |
| Title:  Director, NIAID | Organization: NIH - NATIONAL INSTITUTES OF HEALTH - HE38 |

| Rating Official's Name *(Last, First Middle)*:  TABAK, LAWRENCE | ☐ CA | ☐ NC | ☐ LT/LE |
|---|---|---|---|

| Rating Official's Signature:  Electronically signed by TABAK, LAWRENCE (Rating Official) | Date: 12/9/2023 |
|---|---|

| Part 2. Progress Review | |
|---|---|
| Executive's Signature:  Electronically signed by MARRAZZO, JEANNE | Date: 3/31/2024 |
| Rating Official's Signature:  Electronically signed by TABAK, LAWRENCE (Rating Official) | Date: 3/30/2024 |
| Reviewing Official's Signature *(Optional)*: | Date: |

**Part 3. Summary Rating**

| *Initial Summary Rating* | ☑ Level 5 Achieved Outstanding Results (AO) | ☐ Level 4 Achieved More than Expected Results (AM) | ☐ Level 3 Achieved Expected Results (AE) | ☐ Level 2 Partially Achieved Expected Results (PA) | ☐ Level 1 Achieved Unsatisfactory Results (UR) |
|---|---|---|---|---|---|

| Rating Official's Name (Last, First, Middle):  TABAK, LAWRENCE | |
|---|---|
| Rating Official's Signature:  Electronically signed by TABAK, LAWRENCE (Rating Official) | Date: 9/22/2024 |
| Executive's Signature:  Electronically signed by MARRAZZO, JEANNE | Date: 9/22/2024 |
| Reviewing Official's Signature *(Optional)*: | Date: |

| *Higher Level Review (if applicable)* | |
|---|---|
| ☐ I request a higher level review.     Executive's Initials: | Date: |
| Higher Level Review Completed:  ☐ | Date: |
| Higher Level Reviewer Signature: | Date: |

| *Performance Review Board Recommendation* | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| PRB Chair Signature:  Electronically signed by JOHNSON, ALFRED C (Performance Review Board Chair) | Date: 11/19/2024 |
|---|---|

| *Annual Summary Rating* | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| Appointing Authority Signature:  Electronically signed by CAMPBELL, CHERYL R. (Appointing Authority) | Date: 1/7/2025 |
|---|---|

**Part 4. Derivation Formula and Calculation of Annual Summary Rating**

| Critical Element | Element Rating | | Weight | Score | | Summary Level Ranges |
|---|---|---|---|---|---|---|
| | Initial | Final (if changed) | | Initial | Final (if changed) | |
| 1. Leading Change | 5 | 5 | 20 | 100 | 100 | 475 - 500 = Level 5 |
| 2. Leading People | 5 | 5 | 20 | 100 | 100 | 400 - 474 = Level 4 |
| 3. Business Acumen | 5 | 5 | 10 | 50 | 50 | 300 - 399 = Level 3 |
| 4. Building Coalitions | 5 | 5 | 20 | 100 | 100 | 200 - 299 = Level 2 |
| 5. Results Driven | 5 | 5 | 30 | 150 | 150 | Any CE rated Level 1 = Level 1 |
| Total: | | | **100 Points** | 500 | 500 | |

OPTIONAL FORM 720 10/2017
PERF: HE00 OM00 USAPerformance

| Part 5. Performance Standards and Critical Elements |
|---|

**Performance Standards for Critical Elements** (The performance standard for each critical element is specified below; examples for the top three performance levels can be found in the system description).

**Level 5:** The executive demonstrates exceptional performance, fostering a climate that sustains excellence and optimizes results in the executive's organization, agency, department or Government-wide. This represents the highest level of executive performance, as evidenced by the extraordinary impact on the achievement of the organization's mission. The executive is an inspirational leader and is considered a role model by agency leadership, peers, and employees. The executive continually contributes materially to or spearheads agency efforts that address or accomplish important agency goals, consistently achieves expectations at the highest level of quality possible, and consistently handles challenges, exceeds targets, and completes assignments ahead of schedule at every step along the way.

**Level 4:** The executive demonstrates a very high level of performance beyond that required for successful performance in the executive's position and scope of responsibilities. The executive is a proven, highly effective leader who builds trust and instills confidence in agency leadership, peers, and employees. The executive consistently exceeds established performance expectations, time lines, or targets as applicable.

**Level 3:** The executive demonstrates the high level of performance expected and the executive's actions and leadership contribute positively toward the achievement of strategic goals and meaningful results. The executive is an effective, solid, and dependable leader who delivers high-quality results based on measures of quality, quantity, efficiency, and/or effectiveness within agreed upon time lines. The executive meets and sometimes exceeds challenging performance expectations established for the position.

**Level 2:** The executive's contributions to the organization are acceptable in the short term but do not appreciably advance the organization towards achievement of its goals and objectives. While the executive generally meets established performance expectations, time lines and targets, there are occasional lapses that impair operations and/or cause concern from management. While showing basic ability to accomplish work through others, the executive may demonstrate limited ability to inspire subordinates to give their best efforts or to marshal those efforts effectively to address problems characteristic of the organization and its work.

**Level 1:** In repeated instances, the executive demonstrates performance deficiencies that detract from mission goals and objectives. The executive generally is viewed as ineffectual by agency leadership, peers, or employees. The executive routinely does not meet established performance expectations/time lines/targets and fails to produce – or produces unacceptable – work products, services, or outcomes.

| Element Rating Level Points | Level 5 = 5 points<br>Level 4 = 4 points<br>Level 3 = 3 points<br>Level 2 = 2 points<br>Level 1 = 0 points |
|---|---|

| Critical Element 1. Leading Change | (Minimum weight 5 points)   Weight   20 |
|---|---|

**Mandatory Performance Requirement:** Develops and implements an organizational vision that integrates key organizational and program goals, priorities, values, and other factors. Assesses and adjusts to changing situations, implementing innovative solutions to make organizational improvements, ranging from incremental improvements to major shifts in direction or approach, as appropriate. Balances change and continuity; continually strives to improve service and program performance; creates a work environment that encourages creative thinking, collaboration, and transparency; and maintains program focus, even under adversity.

Agency-Specific Performance Requirements:

**Mandatory HHS-Wide Performance Requirement:**  Promote efforts to improve climate literacy across the HHS workforce, emphasizing education for sustainability.

Rating Official Narrative (Optional):

| Critical Element Rating - Leading Change | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

OPTIONAL FORM 720 10/2017
PERF: HE00 OM00 USAPerformance

| Critical Element 2. Leading People | (Minimum weight 5 points)    Weight    20 |
|---|---|

**Mandatory Performance Requirement:** Designs and implements strategies that maximize employee potential, connects the organization horizontally and vertically, and fosters high ethical standards in meeting the organization's vision, mission, and goals. Provides an inclusive workplace that fosters the development of others to their full potential; allows for full participation by all employees; facilitates collaboration, cooperation, and teamwork, and supports constructive resolution of conflicts. Ensures employee performance plans are aligned with the organization's mission and goals, that employees receive constructive feedback, and that employees are realistically appraised against clearly defined and communicated performance standards. Holds employees accountable for appropriate levels of performance and conduct. Seeks and considers employee input. Recruits, retains, and develops the talent needed to achieve a high quality, diverse workforce that reflects the nation, with the skills needed to accomplish organizational performance objectives while supporting workforce diversity, workplace inclusion, and equal employment policies and programs.

Agency-Specific Performance Requirements:

**Mandatory HHS-Wide Performance Requirements:**

Leads organizational action to:

- Understand assigned employee's work experiences, including facilitating participation in the annual Federal Employee Viewpoint Survey (FEVS) and other data collection efforts;
- Prioritize workforce management areas needing improvement;
- Develop data-informed action plans to improve employee engagement and job satisfaction;
- Implement plans; and
- Assess progress and adjust actions to improve the workforce conditions that strengthen assigned employees' levels of commitment and capability.

----------

Integrates diversity, equity, inclusion, and accessibility as a key strategic mission and operation priority at all levels of the organization, which supports and champions the Department's commitment by aligning policies and practices that:

- Promote access and equity through staff selection and promotion;
- Create an inclusive, equitable, and open working environment by empowering others and encouraging diversity of thought;
- Develop and implements initiatives to strengthen DEIA; and
- Promote learning and development opportunities to advance cultural competence/DEIA.

----------

Establishes organizational systems to prevent harassment and discrimination.

----------

In accordance with Executive Order 14058, HHS is identified as a High Impact Service Provider.  The executive shall support the Department's efforts in developing human-centered design service delivery that equitably and effectively aids the underserved.  The executive shall improve the customer experience through the reduction of administrative burdens and the simplification of public-facing and internal processes within their organization.

Rating Official Narrative (Optional):

| Critical Element Rating - Leading People | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| Critical Element 3. Business Acumen | (Minimum weight 5 points)  Weight  10 |
|---|---|

**Mandatory Performance Requirement:** Assesses, analyzes, acquires, and administers human, financial, material, and information resources in a manner that instills public trust and accomplishes the organization's mission. Uses technology to enhance processes and decision making. Executes the operating budget; prepares budget requests with justifications; and manages resources.

Agency-Specific Performance Requirements:

**Mandatory HHS-Wide Performance Requirements:**

In compliance with the Privacy Act of 1974, the e-Government Act of 2002, Executive Order 13719, and HHS privacy and risk management program, the executive will: 1) ensure all Personally Identifiable Information (PII) and Protected Health Information (PHI) with which your organization works is covered by an approved federal records schedule and that adherence to that schedule occurs regularly; 2) ensure proper data sharing agreements are in place and being appropriately executed; 3) ensure roles and responsibilities for data protection and privacy are clearly assigned and appropriately communicated; and 4) ensure that all subordinate employees complete annual privacy training.

----------

In compliance with the Small Business Act of 2010 and Executive Order 13985, the executive will provide support of procurement functions for the successful execution of the Department's small business prime contracting and subcontracting goals and percentages by: (1) promoting a climate or environment that is responsive to small business concerns; (2) communicating the importance of achieving the agency's small business contracting goals; and (3) encouraging small business awareness, outreach, and support.

Within delegated authority, the executive will support HHS' targets of granting:

1. 30.00% of prime small business overall performance goal
2. 15.50% of contracts to Small, Disadvantaged Businesses (SDBs)
3. 8.83% of contracts to Women-owned Small Businesses (WOSBs)
4. 3% of contracts to Service-disabled Veteran-owned Small Businesses (SDVOSBs)
5. 2% of contracts to small businesses in Historically Underutilized Business Zones (HUB Zones)
6. 31.00% of subcontracting small business overall performance goal (i.e., dollars obligated to small business through subcontracting plans)

Rating Official Narrative (Optional):

| Critical Element Rating - Business Acumen | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| Critical Element 4. Building Coalitions | (Minimum weight 5 points)  Weight  20 |
|---|---|

**Mandatory Performance Requirement:** Solicits and considers feedback from internal and external stakeholders or customers. Coordinates with appropriate parties to maximize input from the widest range of appropriate stakeholders to facilitate an open exchange of opinion from diverse groups and strengthen internal and external support. Explains, advocates, and expresses facts and ideas in a convincing manner and negotiates with individuals and groups internally and externally, as appropriate. Develops a professional network with other organizations and identifies the internal and external politics that affect the work of the organization.

Agency-Specific Performance Requirements:

Rating Official Narrative (Optional):

| Critical Element Rating - Building Coalitions | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| Critical Element 5. Results Driven | (Minimum weight 20 points)  Weight  30 |
|---|---|

The Results Driven critical element must have at least 1 performance requirement but no more than 5.

This critical element includes specific performance requirements expected of the executive during the appraisal period, focusing on measurable results from the Department's strategic plan, and/or the executive's Op/StaffDiv strategic plan, and other measurable outputs and outcomes clearly aligned to organizational goals and objectives. At a minimum, the performance requirements must contain measurable results and their quality indicators describing the range of performance at Level 3 for each result specified. In addition to the quality indicators, applicable measures of quantity, timelines, and/or cost-effectiveness may be included as appropriate. It is recommended to also establish the threshold quality indicators and measures for Levels 5 and 2. Indicators must reflect the same level of performance as the respective performance standard contained in Part 5.

Strategic Alignment–identify clear, transparent alignment to agency strategic planning initiatives (e.g., relevant agency or organizational goals/objectives with cited page numbers from the Strategic Plan, Congressional Budget Justification/Annual Performance Plan, or other organizational planning document) in the designated section for each performance requirement.

**Note:** Performance requirements *must contain results and quality indicators* that are clearly and differentially identified.  As stated in the Department's opening directive memorandum, The Results Driven critical element will be weighted **no more than 50%**.  To clearly identify results and measures, **bold results**, underline measures, and quality indicators must be in red.

| Performance Requirement 1: | Strategic Alignment: |
|---|---|
| **Catalyze scientific innovation**, **stimulate collaborations** across the Institutes and Centers, as well as scientific disciplines, and **advance trans-NIH priorities** in at least one cross-cutting area of biomedical or behavioral research. Foster partnerships in both the public and private sectors to capitalize on existing activities and resources. | HHS Strategic Goal 2: Objective 2.1: Improve capabilities to predict, prevent, prepare for, respond to, and recover from disasters, public health and medical emergencies, and threats across the nation and globe.<br>HHS Strategic Goal 2: Objective 2.2: Protect individuals, families, and communities from infectious disease and non-communicable disease through equitable access to effective, innovative, readily available diagnostics, treatments, therapeutics, medical devices, and vaccines.<br>HHS Strategic Goal 4: Objective 4.1: Improve the design, delivery, and outcomes of HHS programs by prioritizing science, evidence, and inclusion.<br>HHS Strategic Goal 4: Objective 4.2: Invest in the research enterprise and the scientific workforce to maintain leadership in the development of innovations that broaden our understanding of disease, healthcare, public health, and human services resulting in more effective interventions, treatments, and programs.<br>HHS Strategic Goal 4: Objective 4.3: Strengthen surveillance, epidemiology, and laboratory capacity to understand and equitably address diseases and conditions.<br>HHS Strategic Goal 4: Objective 4.4: Improve data collection, use, and evaluation, to increase evidence-based knowledge that leads to better health outcomes, reduced health disparities, and improved social well-being, equity, and economic resilience.<br>HHS Strategic Goal 5: Objective 5.1: Promote effective enterprise governance to ensure programmatic goals are met equitably and transparently across all management practices.<br>HHS Strategic Goal 5: Objective 5.2: Sustain strong financial stewardship of HHS resources to foster prudent use of resources, accountability, and public trust.<br>HHS Strategic Goal 5: Objective 5.3: Uphold effective and innovative human capital resource management resulting in an engaged, diverse workforce with the skills and competencies to accomplish the HHS mission.<br>HHS Strategic Goal 5: Objective 5.4: Ensure the security and climate resiliency of HHS facilities, technology, data, and information, while advancing environment-friendly practices. |

Case 1:25-cv-04144-JRR     Document 1-1     Filed 12/16/25     Page 88 of 93

| Performance Requirement 2: | Strategic Alignment: |
|---|---|
| Enhance scientific stewardship to **increase scientific integrity, public accountability, and social responsibility in the conduct of science** in <u>at least one cross-cutting area of biomedical or behavioral research</u>. Such activities may include efforts aimed at strengthening the scientific workforce, ensuring rigor and reproducibility of research, reducing administrative burden, and engaging in proactive risk management practices. | HHS Strategic Goal 4: Objective 4.1: Improve the design, delivery, and outcomes of HHS programs by prioritizing science, evidence, and inclusion.<br>HHS Strategic Goal 4: Objective 4.2: Invest in the research enterprise and the scientific workforce to maintain leadership in the development of innovations that broaden our understanding of disease, healthcare, public health, and human services resulting in more effective interventions, treatments, and programs.<br>HHS Strategic Goal 4: Objective 4.3: Strengthen surveillance, epidemiology, and laboratory capacity to understand and equitably address diseases and conditions.<br>HHS Strategic Goal 4: Objective 4.4: Improve data collection, use, and evaluation, to increase evidence-based knowledge that leads to better health outcomes, reduced health disparities, and improved social well-being, equity, and economic resilience.<br>HHS Strategic Goal 5: Objective 5.1: Promote effective enterprise governance to ensure programmatic goals are met equitably and transparently across all management practices.<br>HHS Strategic Goal 5: Objective 5.2: Sustain strong financial stewardship of HHS resources to foster prudent use of resources, accountability, and public trust.<br>HHS Strategic Goal 5: Objective 5.3: Uphold effective and innovative human capital resource management resulting in an engaged, diverse workforce with the skills and competencies to accomplish the HHS mission.<br>HHS Strategic Goal 5: Objective 5.4: Ensure the security and climate resiliency of HHS facilities, technology, data, and information, while advancing environment-friendly practices. |

Rating Official Narrative (Optional):

| Critical Element Rating - Results Driven | ☑ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

**Part 6. Summary Rating Narrative *(Mandatory)***

Case 1:25-cv-04144-JRR    Document 1-1    Filed 12/16/25    Page 89 of 93

Dr. Marrazzo is an inspirational leader who achieved exceptional results in the pursuit of the National Institute of Allergy and Infectious Diseases' (NIAID) mission. It is a privilege to work with Dr. Marrazzo.

In fall of 2023, Dr. Marrazzo began her tenure as the sixth NIAID Director, overseeing a budget of more than $6 billion that supports research to advance the understanding, diagnosis, and treatment of infectious, immunologic, and allergic diseases. She brought with her a wealth of knowledge and experience in discovery and implementation science focused on the human microbiome, specifically as it relates to female reproductive tract infections and hormonal contraception; prevention of HIV infection using biomedical interventions, including preexposure prophylaxis (PrEP) and microbicides; and the pathogenesis and management of bacterial vaginosis (BV), sexually transmitted diseases in people living with HIV, and management of antibiotic resistance in gonorrhea.

Her first priority was to thoughtfully outline her vision for NIAID to ensure the strategic use of resources to further the Institute's mission. She engaged with scientific, advocacy, and federal stakeholders to solicit feedback on the key research priorities being proposed and how best to integrate crosscutting themes, such as advancing women's health and expanding research inclusivity, across those priorities. Dr. Marrazzo also catalyzed NIAID staff commitment to the mission through thoughtful communication and solicitation of their ideas for the future of the Institute. She is currently working towards finalizing the details on the updated NIAID Strategic Plan, emphasizing the commitment to advance foundational research in immunology and pathogen biology, applied research addressing infectious and immune-mediated diseases, pandemic preparedness, and prevention, treatment, and cure strategies for HIV/AIDS. Her goal is to publish the Strategic Plan early in 2025.

Dr. Marrazzo is committed to strengthening the NIAID workforce and maintaining the pipeline of infectious disease researchers. As such, she promoted the expansion of novel tools and resources for staff professional development and retention while supporting an atmosphere of civility and inclusion. Training courses were designed for supervisors to aid in nurturing team culture that encourage environments where all voices are solicited and respected. Additionally, the External Leadership Training Dashboard was created to provide NIAID staff access to educational opportunities that support professional growth and empower the next generation of leaders. As reports of the decline in the number of applicants for infectious disease fellowships began to surface, Dr. Marrazzo quickly made a call to action to evaluate the NIAID research training grant portfolio. She assembled a working group and charged them to make recommendations to accelerate the number of promising young scientists coming into the field. Her insights were critical to the prompt implementation of several of the proposals made by the working group, including increasing success rates and salaries to make infectious disease research at NIAID more attractive to candidates considering their futures. Furthermore, she actively communicated her enthusiasm for developing the next generation of scientists broadly at many scientific meetings, explaining the importance of people in translating foundational scientific advances into interventions that impact public health.

As a lesson learned from the COVID-19 pandemic, Dr. Marrazzo's leadership has exemplified transparency and collaboration. During two distinct disease outbreaks with global implications, she did not hesitate to lead NIAID and NIH's response and assume a scientific leadership role amongst responding government agencies and external stakeholders. Dr. Marrazzo immediately mobilized NIAID's research networks and intramural program to investigate critical knowledge gaps. For example, at the onset of the outbreak of highly pathogenic influenza (H5N1), she had the foresight to initiate studies to characterize the transmission of the circulating H5N1 virus and immediately grasped the impact of infections in dairy cows on transfer of virus to raw milk and implications of that on the safety of the nation's milk supply. As inquiries from Congress and the public increased, she had the foresight to quickly document NIAID research response activities in the *NIAID H5N1 Research Agenda* and share it broadly, being the first federal entity to do so. Additionally, she facilitated the prompt sharing of data and reagents with the scientific community as they became available to bridge partnerships between scientists and accelerate the research response in the United States. She worked closely with federal partners at the USDA, HHS, and the White House for a coordinated and informed response that eliminated duplication of effort across agencies.

Recently the WHO declared mpox as a public health emergency of international concern. Even before the declaration, Dr. Marrazzo ensured that NIAID was at the forefront of methodically evaluating medical countermeasures that may ultimately prevent and treat disease, thereby mitigating another potential pandemic. She capitalized on the robust partnership between NIAID and the Democratic Republic of Congo's Institut National de la Recherche Biomédicale to conduct the PALM007 clinical trial to assess the efficacy of the antiviral drug tecovirimat in reducing the duration of mpox lesions in children and adults. While the initial results of this trial did not impact the resolution of lesions as anticipated, it did provide evidence that the drug was safe in this population and that high-quality supportive care made had a positive impact on health outcomes. Dr. Marrazzo recognized that availability of vaccine is of utmost importance for global prevention of infection and directed a study to examine dose-sparing strategies of the only currently available vaccine (MVA-BN, sold as JYNNEOS). The results of this study showed that a dose-sparing intradermal mpox vaccination regimen was safe and generated an antibody response equivalent to that induced by the standard regimen at six weeks, providing invaluable information for the expeditious dissemination of vaccine where it is needed most. Given that mpox also significantly impacts children, Dr. Marrazzo saw the need to evaluate this vaccine in younger people. As such, she initiated a Phase 2 clinical trial of this vaccine in healthy adolescents ages 12 to 17 years and the results are anticipated soon.

Dr. Marrazzo's considerable oversight of NIAID's extensive research portfolio is evident in the scientific advances that continue to emerge outside of a public health emergency from activities across the Institute. For example, recent results from a clinical trial of an experimental vaccine candidate for malaria showed that it conferred protection from parasite infection and clinical malaria that was sustained over a span of two years in healthy women ages 18 to 38 in a malaria endemic country. Furthermore, the women who conceived during the study were protected from malaria in pregnancy, which may prove to lower malaria-related early pregnancy losses. Another promising outcome for maternal health from the HIV Prevention Trials Network indicated that long-acting injectable cabotegravir was safe and well tolerated as HIV pre-exposure prophylaxis before and during pregnancy among cisgender women. These scientific achievements and many others not mentioned here reveal Dr. Marrazzo's commitment to reduce the public health burden for infectious and immune-mediated diseases that includes all people who can benefit from them.

## Part 7. Executive's Accomplishment Narrative *(Optional)*

**Element 1—Leading change**

• Oversaw to the development of the 2024 Update to the NIAID Strategic Plan for Tuberculosis Research • Oversaw to the development of a completely new NIAID Strategic Plan reflecting the scientific and organizational priorities of new leadership • Provided leadership and emphasis on the importance of health disparities and health equity research in the intramural and extramural NIAID portfolio, including establishing an Associate Director role at NIAID to review and manage these aspects of the NIAID research • Supported organizational changes to increase efficiencies and to better align oversight of scientific priorities • Created the Office of Pharmaceutical Research Management responsible for pharmacy and pharmaceutical oversight for some of NIAID's clinical trials, aligning with Optimize NIH efforts to manage workload distribution and harmonize business processes • Led standardization of data and information exchange by developing Common Data Elements in collaboration with NIH ODSS addressing Congressional Language • Supported organizational changes stemming from senior scientific staff departures/retirements• Supported organizational changes to increase efficiencies and to better align oversight of scientific priorities • Continued efforts to automate business processes and reduce paperwork • Provided guidance and direction for WHO advisory report "National stockpiles for radiological and nuclear emergencies: policy advice" • Facilitated discussions with ORWH Director to transfer NIAID-led ADCC activities to ORWH Office of Autoimmune Disease Research (OADR) •Coordination of NIAID biosecurity initiatives and programs with the newly formed OPPR • Supported NIH change management goals of Optimize NIH Acquisitions effort • Developed a research agenda to respond to the H5N1 outbreak • Evaluated NIAID Single IRB Implementation and the International epidemiology Databases to Evaluate AIDS (IeDEA) program • Scientific leadership and coordination of the NIAID response to the emergence of H5N1 influenza in domestic cattle • Co-organized and co-chaired 2 sessions at 2nd Federal Interagency Workshop on NHP Availability, Resources, and Needs for Biomedical Research • Led collaborations with advocacy groups and community health workers to improve recruitment of underrepresented groups in NIAID-supported research • Implemented 2 electronic systems to compile, manage, and validate contents of Health Authority submissions, enabling seamless regulatory submissions to FDA • Represented HHS on classified government panel on medical effects of radiation and contributed to USG Radioactive Material Security Implementation Plan • Completed an organizational change for the DAIDS Therapeutics Research Program • Hired new leadership for the exceptionally productive Vaccine Research Program • Supervised implementation of NIAID Prototype Pathogen approach and oversees new R&D of Vaccines and Monoclonal Antibodies for Pandemic Preparedness (ReVAMPP) network • Implemented organizational changes to clinical programs including quality management system, risk-based monitoring, streamlined safety oversight and updated template to facilitate protocol development • Served on Steering Committee for NIH Climate Change & Health (CCH) Initiative. Hosted second NIH Climate & Health Visiting Scholar

**Element 2—Leading People**

• Provided staff professional & leadership development programs aimed to engage employees in all phases of their careers and at all levels of the organization • Developed workforce models to help balance workloads among NIAID's regulatory and grants management offices • Organized and sponsored 25 state-of-the-art scientific conferences to foster collaborations and promote new directions and 51 meetings to foster collaborations within and across programs • Recruited 3 branch/office chiefs • Provided professional opportunities leading to 41 staff co-authoring 59 peer reviewed articles and 6 workshop summaries • 53 staff served on 120 committees/working groups spanning NIH, other Federal agencies, and non-governmental entities: 9 as chair or co-chair • 37 staff participated in programs to increase diversity, equity, and inclusion at Division, IC, and NIH levels, including NIH EDI Indigenous Peoples Engagement Committee; COSWD Diversity Catalyst; NIAID ORTSP Review Oversight Committee; NIAID DEIA Communities of Practice; NIH Anti-Racism Steering Committee; Intramural Retention Subcommittee; NIH Sex and Gender Minority Research Office Subcommittee; NIAID DEIA Council; and DAIT DEIA Working Group • Served as Chair of the IDWeek Program Committee, helping train the next generation of ID professionals • Supported NIH UNITE to identify and address structural racism. Hosted diversity and inclusion seminars on infectious diseases and public health topics in minority communities • Funded many applications to address health disparities under the following initiatives: *NIAID and NIDDK Research Opportunities for New and "At-Risk" Investigators to Promote Workforce Diversity; Advancing Development of Diagnostics for Congenital and Adult Acquired Syphilis* • Oversaw and directed the development of new and integrated financial management systems to assure the effective execution and transparency of the Institutes appropriated annual and multi-year funding processes • Ensured that adequate internal controls are developed and operative so that government resources are efficiently and effectively managed • Emphasized FEVS importance; Continued plans to increase belief in action; Promoted participation in the 2024 FEVS • Conveyed vision to the institute for maintaining a pipeline of talented researchers and focusing on growing and retaining early- and mid-career investigators, while addressing DEIA • Provided >1600 staff professional & leadership development programs aimed to engage employees in all phases of their careers and at all levels of the organization • Supporting NIAID's Anti-Harassment and Civility initiatives set conduct expectations across the Institute on civility by delivering resources and 21 offerings of 5 unique courses available to all staff in the areas of communication and cultivating an inclusive culture • Led EPIC @ NIAID leadership development program for non-supervisory GS 13-15 participants exposing them to action learning, practical models and concepts that support the development and practice of leadership capacities • Provided leader transition support by partnering with hiring officials and leadership teams to prepare the organization for new leaders and to navigate the transition period effectively • Delivered Leading NIAID in the 21st Century leadership program, providing opportunity for GS 9-12 staff to develop leadership capacities to build NIAID's leader pipeline • Ensured all staff completed required mandatory training related to anti-harassment, whistleblower protection, retaliation, Veterans and Uniformed Services employment, continuity of operations, and new employee orientation • Provided organization development support to increase the capacity of individuals, groups and teams to effectively lead in contexts of change and transition

**Element 3—Business Acumen**

• Developed an electronic Quality Management System and Trial Master File (TMF) to ensure regulatory compliance in clinical trials to be integrated with existing systems • Secured necessary expertise to strengthen regulatory compliance with regards to TMF and the use of electronic systems in clinical research • Expedited expansion NIAID food allergy research program with additional $6M congressional appropriation enabling expansion of clinical sites • Awarded SUNBEAM-ABC to support multi-omic and systems biology analyses • Engaged >12 companies to foster increased use of novel vaccine adjuvants developed through NIAID's vaccine adjuvant programs • Fulfilled 439 NHP Reagent Resource requests, launched 20 new reagents (189 unique

OPTIONAL FORM 720 10/2017
PERF: HE00 OM00 USAPerformance

reagents total) with 13 in development; 33 publications cited reagent use • Provided vital resources to SPF Macaque Colonies, increasing current and future availability of NHP for NIH- and DOD-sponsored research • Provided vital resources to develop gene-edited pigs for xenotransplantation research • Developed novel funding opportunity to improve understanding of immunologic processes and events that drive autoimmune disease • Secured additional funding to develop collaborative workspace and CDEs within ImmPort • Oversaw implementation of NIH data management and sharing (DMS) policy for applications and proposals • Developed training for scientific, program, and support staff on extramural activities and policies • Oversaw development and improvement of technological systems in scientific review, nominations/appointments for committee management, tracking/review of SBIR contracts and research supplements • Evaluated different funding mechanisms, terms, policies to improve management of funded awards • Completed 5 onsite CDC laboratory assessments, 3 Interagency Select Agency Review Group (ISARG) meetings for continued extramural foreign select agent policy award compliance • Conducted 142 grant/contract review meetings with 1,836 reviewers for 1,196 total single and multi-component applications and 253 contract proposals (total requested costs: $5.03B) • Issued 2,034 reviewer reimbursement payments (1,558 for NIAID), totaling $602,400 • Submitted 9 SGE nomination slates for NIH and HHS approval (3 for NIAID) • Oversaw 17 Federal Advisory Committees for NIAID and Service Center clients (total operational costs: ~$13.5M) • Published 213 articles in 21 issues of NIAID Funding News to highlight extramural policies and funding guidance for research community, with >200,306 subscribers • Published 94 articles in 10 issues of Inside Extramural for 1031 staff to provide guidance on extramural policies, resources, and practices • Successfully launched the NIAID Travel Management System (NTMS) • Continued development of enhancements and new features including integration with NEAR • Managed acceleration of NIAID direct COVID appropriation to minimize funding rescission of NIAID Supp 1 funding through the Fiscal Responsibility Act • Provided leadership and guidance regarding increased royalty collections • Managed over $3 billion (Direct and IDDA funding) COVID funds• Managed and directed the integration of all phases of the budgetary process for all appropriated NIAID total of $6.56B as well as COVID Direct Supplementals ($230M) and non-appropriated funds including Royalties, CRADAs, Gifts, and COVID related IDDAs • Implemented a new approach to allocate and track the institute's $130M training and career portfolio and scientific workforce diversity initiatives • Led efforts to maximize the impact of financial data processing and sharing within and outside the Institute • Ensured that adequate internal controls are developed and operative so that government resources are efficiently and effectively managed • Developed a space tracking application for DIR to support placement of scientific research programs • Routine updating of NIAID space database to document changes in space assignment and confirm usage and allocation with a quarterly report • Lead the facility improvement planning process • Developed Activation Plan for Building 40A including the plan for furniture procurement, equipment procurement, and relocation of all users in that facility as coordinated with ongoing construction project • Consolidation of storage facilities to provide a more efficient and cost effective model to track inventory and protect stored assets. Annual Cost Savings is $500,000 due to consolidation of Boiling Brook facility into the TSF in Gaithersburg • Directed negotiations for off-campus building spaces resulting in more control and financial stability • Updated OWS electronic storage drive for all staff access • Updated calendar and contact tools to include all staff as well as updating emergency response contacts and processes • Developed dashboard to monitor and track NIAID training grant portfolio and diversity initiatives • Provided support for implementation of Data Management Sharing Plans to meet January 31, 2023 deadline • Management and distribution of COVID-related royalty funds • Supported for high-value, high-priority research projects in vaccine development • Strengthened the NIAID implementation of data sharing policies • Supported eRA efforts to improve NIH-wide referral system (IRM) • Initiated collaboration to develop a neural-network based coding tool to increase NIAID's reporting efficiency • Analyzed NIAID grants portfolio and funding data to help inform policy decisions • Applied machine learning to streamline workflows and enhance decision making • Negotiated/executed multi-year IAA with Defense Logistics Agency to purchase drugs for some of NIAID's clinical trials, to minimize yearly negotiations and streamline process • Secured NIH ODSS and NIAID ODSET funding for Common Data Elements (CDEs) for food allergy and autoimmune and other immune-mediated diseases • Developed funding opportunity to expand research in vaccine and antibiotic allergy, a critically underfunded research area • Renewed and awarded 6 highly successful FY24 initiatives and released 10 FY25 NOFOs in basic immunology, including new Computational Models of Influenza Immunity initiative • Provided guidance for a new Internal Referral Module (IRM) to improve NIH-wide grant and contract referral systems • Initiated collaboration to develop a neural-network based coding assistance tool to increase NIAID's ability to generate reports and respond to data calls more efficiently • Developed machine learning predictions to streamline workflows and assist with decision making at NIAID, especially in the areas of biodefense and universal influenza vaccine reporting • Provided portfolio analysis data for a number of different NIAID programs to inform decision making • Continued to work closely with the public patient advocacy groups (e.g.DC-PFAP) to decrease the rate of new HIV infections in Washington D.C. to improve the health of district residents living with HIV , and strengthen the city's response to the HIV/AIDS epidemic

**Element 4—Building Coalitions**

• Exchanged information among diverse stakeholders through 17 congressional briefings/events, 1 congressional hearing, 19 meetings with constituent groups, 79 talks, 25 media interviews, 14 meetings with foreign delegations, 38 congressional RFIs, and an estimated 978 public inquires. Her leadership resulted in the negotiation of 604 new non-license agreements including 13 Cooperative Research and Development Agreements, 6 Conditional Gift Agreements, 12 Clinical Trial Agreements; 40 license agreements for NIAID intellectual property; 16 licenses for CDC intellectual property including 5 licenses to support development of influenza diagnostics that can detect influenza types and subtypes quickly and accurately • Updated language in CSR guidelines to better describe NIAID's mission and reduce application withdrawals and transfers • Promoted information sharing throughout NIH through best practices in tracking and analyzing portfolios • Served on Organ Transplant Affinity Group to promote alignment between HRSA and CMS and implement recommendations of 2022 NASEM report *Realizing the Promise of Equity in the Organ Transplantation System* • Co-chaired trans-NIH NHP Resource Planning WG to develop NHP strategic management plan in response to FY24 Senate Appropriations Report • Collaborated with NIEHS/NHLBI/CDC to add questions on allergic diseases in NHANES survey and conduct serological testing to gather baseline data about American adults and children in these areas• Organized and hosted Trans-NIH ME/CFS research conference, presenting latest scientific advances and highlighting targets for potential interventions • Organized upcoming workshop on *"Regulatory T Cell Therapies to Treat Autoimmune Diseases and Transplant Rejection – Challenges and Opportunities"* to identify critical growth areas • Represented NIAID on newly formed OADR Coordinating Committee for Autoimmune Diseases Research and significantly contributed to the new "*NIH Strategic Plan for Autoimmune Disease Research*" • Secured OADR co-funding for NIAID research in autoimmune diseases • Collaborated with French Institute of Radiation Protection to fund 2 joint projects • Collaborated with NCI (SeroNet Consortium); NICHD, NCBI, NLM (NIH Cloud Platform Interoperability); NIAID (AccessClinicalData@NIAID project); and NIAID ODSET (SBIR programs) to maximize data sharing • Promoted information exchange and collaboration with NLM as they seek to learn more about how we track and analyze our portfolios • Led meetings with scientific and professional organizations to engage in a dialogue, seek input and exchange ideas about

Case 1:25-cv-04144-JRR    Document 1-1    Filed 12/16/25    Page 92 of 93

NIAID priorities and resources • Worked closely with *HIV/AIDS* Network Coordination (HANC) Community Partners to ensure the community's ideas, concerns and vision are heard • Collaborated with USG partners to coordinate responses to public health priorities; for example, collaborating with NCBI, USDA and NIAID CEIRR accelerating the public release of the 2024 H5N1 outbreak data; CARB National Action Plan 2020-2025; HHS pandemic and seasonal influenza risk preparedness • Provided expertise on P3CO and DURC policies with NIAID/OD, NIH/OD, HHS and OSTP/NSC to inform the public, promote awareness of NIAID processes and convey challenges/opportunities NIAID identified over 10 years implementing these and other biosafety/biosecurity policies • Represented NIH to brief Congress/staff on: NextGen/mucosal COVID-19 vaccines, EcoHealth Alliance, antimicrobial resistance, pandemic preparedness, APP, coccidioidomycosis, RBLs, and mpox • Served on interagency working groups (for DoD, DTRA, BARDA, CDC, FDA, HHS, DHS, & others), including HHS Tickborne Diseases WG; PHEMCE; CARB Task Force; National Influenza Vaccine Modernization Task Force & Federal TB Task Force; USAID, WHO, NIAID Collaborative Working Group on NTDs; Interagency Advisory Group for the President's Malaria Initiative (PMI) • Participated in a large variety of external working groups including: Global Vaccine & Immunization Research Forum; Coalition for Epidemic Preparedness Initiative; WHO Product Dev. Vaccine Advisory Comm.; WHO Malaria Policy Advisory Group; NIH-BMGF Working Groups; Immunization Agenda 2030 Council • Initiated collaborative research initiatives with industry and other government agencies for a large variety of high-priority development efforts including: a the development of rhinovirus vaccines; vaccine development for measles and mumps viruses; research on mucosal delivery of vaccine antigens by adenoviruses; and development of antibody diagnostics to enhance biosecurity

Element 5 Result A—Organizational improvements utilizing data-driven decision-making approaches

• Rolled out an enhanced Workforce Management Solution to provide key data for making decisions related to workforce allocations, planning, and record data quality • 11 new Dashboards were implemented to improve Biodefense, Cybersecurity, DEA Scientific Review Program, IRF, DIR Neuroimmunological Diseases Section, OAS, OSPIDA Data Analytics Branch, OCICB, and TB Portals programs • Implemented private GenAI ChatBot and DocBot across NIAID to save users substantial amount of time in the review and development of policies, as well as generate other business documentation summaries • Developed and expanded dashboards to facilitate data-driven decision-making regarding grants, review, administrative, acquisitions, & financial management and automate previously manual processes • Collaborated to standardize review procedures for K and T applications and enhance spreading of scores across the full score range • Improved enterprise electronic systems for peer review (including SRDMS, eCPS, eRSS), which are increasingly used by NIH and ARPA-H community, contributing to NIH-wide community of practice • Continued to grow Extramural Staff Trainings on an intranet resource that houses more than 32 key training links and presentations to educate staff on grants, contracts, scientific review, clearance of publications, and more • Established and continuously refined a new electronic system, APPRAISE, an NIAID Supplement Tracing and Review System, to enhance efficiency and adequacy to receive, track, evaluate, and issue research supplements • Established novel trans-NIAID budget forecasting systems to anticipate interim paylines for SBIR/STTR and research training mechanisms earlier in the fiscal year • Oversaw development and improvement of technological systems in scientific review, nominations/appointments for committee management, tracking/review of SBIR contracts, and research supplements • Advanced initiatives through an Artificial Intelligence Working Group, including partners from other ICs, to strategize potential uses of generative AI for critical work processes.

**Element 5 Result B—Scientific innovation**

• Published results of Stage 1 of Phase 3 clinical trial OUtMATCH, demonstrating omalizumab reduces the risk of allergic reactions to multiple foods. Resulted in FDA approval of first treatment for multi-food allergy • Completed Stage 2, comparing omalizumab alone to oral immunotherapy for food allergy, results anticipated FY25 • Continued recruitment of mother-infant dyads (2,550 mothers and 2,140 neonates to date) to SUNBEAM birth cohort study to identify prenatal and early childhood markers of allergic disease; collected >260K biosamples

• Published results of population-based, longitudinal birth cohort quantifying risk of future asthma development associated with Respiratory Syncytial Virus infection in infancy

• Renewed CoFAR initiative, expanding the number of clinical sites per Congressional directive

• Substantially extended survival of pig-to-NHP kidney, heart, liver and islet xenografts, supporting FDA's compassionate use approvals in human xenotransplantation; and prolonged pig kidney graft survival in sensitized NHP by expression of multiple human transgenes in a triple knockout pig, supporting concept of pig "bridging graft" for sensitized patients with limited transplant options • Demonstrated withdrawal of MMF in stable quiescent lupus patients results in only a slight increase in flare of disease, enabling medication withdrawal based on individual circumstances and risk tolerance • Showed that population-based newborn screening for SCID confers survival benefits from earlier implementation of hematopoietic stem cell transplantation • Developed novel humanized mouse model that fully replicates B and T cell development and function without the need for human fetal cells or tissues; will enable studies of infectious diseases, cancer, autoimmunity, and vaccine development • Extended analyses of COVID-19 IMPACC cohort identifying omics signatures predictive of disease severity and/or 28-day mortality • Identified human CD8+ and CD4+ T-cell ratios and gene expression signatures associated with immune resilience and longevity despite immune stressors • Published findings from a large pediatric dengue fever cohort challenging the dogma that severe disease is preferentially associated with secondary infections • Submitted 13 new INDs and IND exemptions; negotiated/executed 1 new CTA with 1 pharmaceutical company for 1 study drug; managed 80 active CTAs; provided regulatory support as Sponsor for 114 active clinical trials conducted at 1109 clinical sites under 13 programs and 38 individual grant awards

• Increased data depositions to ImmPort by 37% to 989, including 184 clinical trials and 357 COVID-19 studies; released 268 new studies. ImmPort is now one of the largest flow cytometry data repositories for research with 5.1M results; and promoted open access, research reproducibility, and data reutilization via TrialShare, containing results of 39 clinical trials, including >6,900 participants, >55K patient visits, and ~504K biological specimens available to researchers • Fulfilled 475 NHP Reagent Resource requests, distributing 112 unique reagents; launched 21 new reagents with 8 in development; 32 publications cited reagent use

• Provided vital resources to 1) maintain NIAID SPF Macaque Breeding Colonies, improving availability of high quality NHPs for NIH-sponsored research; and 2) develop gene-edited pigs for xenotransplantation research • NIAID-funded IMPAACT P1115 study: four children remained free of detectable HIV

for more than one year after pausing ART, providing evidence that very early HIV treatment enables the neonatal immune system to limit HIV reservoir development and increase the prospect of HIV remission • NIAID supported Gilead development of the twice-yearly injectable antiretroviral drug lenacapavir (LEN), PURPOSE 1 Phase 3 trial, which reported 100% efficacy for HIV prevention among cisgender women in South Africa and Uganda during June 2024 • Facilitated clinical evaluation of novel AMR treatments, including apramycin, a structurally unique aminoglycoside for Gram-negative bacteria; VNRX-7145, an oral antibiotic for cUTIs; Epetrabole as a combination therapy for *B. pseudomallei*; and CRS3123, an oral antibiotic for *C. difficile* • Awarded PReDiCTR consortium to advance the preclinical design and clinical translation of TB regimens • Authorization/implementation of a large variety of product development : Qdenga, a novel vaccine, received WHO prequalification; NmCV-5, pentavalent meningococcal vaccine, recommended by WHO SAGE and introduced in Nigeria following results of clinical study from the Infectious Diseases Clinical Research Consortium • Co-authored 40 scientific papers this year; organized, exhibited, and presented at 17 scientific conferences and workshops • TB Portals Program was included in this year's World TB Day address • Developed multiple AI based algorithms for predicting TB severity score, TB lesion segmentation, X-ray and biomarkers scoring and predicting, and X-ray image data quality classification • Development of a non-human primate model for norovirus infection • Demonstration that one subcutaneous dose of a monoclonal antibody can protect children from clinical malaria • Identification of a human monoclonal antibody targeting a novel protective epitope on the underside of the influenza neuraminidase protein • Mucosal boosting by an adenoviral vector provides durable protection from heterologous SARS-CoV-19 challenge in non-human primates • Development of a stabilized human metapneumovirus (HMPV) prefusion trimer that elicits high-titer neutralizing antibody responses in mice and non-human primates • Recruited 3 new laboratory chiefs to lead labs of viral diseases, immunoregulation, and the human microbiome •Recruited 3 new tenured investigators in the areas of allergy and genetic epidemiology • Initiated searches for tenure track investigators in viral diseases, neuroimmunology, bacteriology (Coxiella), and tick-borne diseases (Lyme) •Published over 800 peer reviewed manuscripts and commentaries on NIAID intramural research, which included but not limited to ground breaking research in the areas of monoclonal antibodies for the treatment of malaria, new insights into fungal diseases, discovery of novel autoinflammatory diseases, and emerging work on H5N1 and mpox • Partnered with NIH Clinical Center on over 200 clinical protocols in many areas to include, but not limited to transplantation of patients with primary immune deficiencies, genomic sequencing of patients admitted to NIAID and other ICs • Supported use of grants, cooperative agreements, and a broad portfolio of procurement vehicles to advance scientific innovation, including SBIR contract solicitations, Broad Agency Announcements, and flexible contracting mechanisms, such as indefinite delivery mechanisms

Element 5 Result C—Scientific stewardship to increase scientific integrity, public accountability, and social responsibility in the conduct of science

• Authored 59 statistical and medical publications and gave 19 invited talks/presentations between October 1, 2023, and September 30, 2024 on biostatistics research • Developed and expanded dashboards to facilitate data-driven decision-making; improved NIH-wide implementation of NIAID e-tools • Improved enterprise electronic systems for peer review (including SRDMS, eCPS, eRSS) • Identified key data governance issues at NIAID, including inconsistent data definitions, insufficient ownership, and unreliable data sources • Implemented multiple HR tools to improve consistency and transparency of personnel actions • Improved peer review efficiency, adding implicit bias training and implementation of online critique templates for reviewers • Supported NIH OD efforts on improving the reporting of scientific data associated with NIH R&D contract projects • Coordinated participation of NIAID in scientific workforce diversity initiatives (e.g., Native American Research Centers for Health, SuRE/SuRE First, Science Education Partnership Program, etc.)

| Part 8. Agency Use |
|---|
| |